NATHAN C. STARR, ROSAMOND STARR BELT AND FRED-
ERIC H. STARR, PLAINTIFFS-APPELLANTS, v. RAY-
MOND H. BERRY, JOHN J. McCUE, SCOTT LUMBER
COMPANY, A CORPORATION OF NEW JERSEY, SADIE
M. JOHNSTON, EXECUTRIX OF THE LAST WILL AND
TESTAMENT OF LESTER A. JOHNSTON, DECEASED,
WILLIAM STARR, RICHARD F. S. STARR, AND RUTH
STARR ROSE, DEFENDANTS-RESPONDENTS.

Argued November 4, 12, 1957—Decided January 20, 1958.

*Mr. Roger C. Ward* argued the cause for plaintiffs-appellants (*Messrs. Pitney, Hardin & Ward*, attorneys; *Messrs. John R. Hardin, Frank C. O'Brien, Roger C. Ward*, of counsel).

*Mr. Israel B. Greene* argued the cause for defendant-respondent Raymond H. Berry (*Mr. Israel B. Greene*, of counsel; *Mr. Murry Brochin*, on the brief).

*Mr. Charles Danzig* argued the cause for defendant-respondent Scott Lumber Company (*Messrs. Riker, Emery & Danzig*, attorneys; *Mr. Charles Danzig*, of counsel).

*Mr. James M. Dunn* argued the cause for defendant-respondent Sadie M. Johnston, executrix of estate of Lester A. Johnston, deceased.

*Mr. James D. Carpenter* argued the cause for defendant-respondent John J. McCue (*Messrs. Carpenter, Bennett, Beggans & Morrissey,* attorneys).

The opinion of the court was delivered by

WEINTRAUB, C. J.   The Chancery Division of the Superior Court dismissed the complaint under the doctrine of *forum non conveniens.*   Plaintiffs appealed to the Appellate Division and we certified the pending appeal on our own motion. Also before us is a motion to dismiss the appeal on the ground that plaintiffs accepted the benefits of the judgment they attack.

### I.

We first will consider the motion to dismiss the appeal. The judgment provided in part that if plaintiffs should institute an action in California within 90 days from the date thereof, defendants shall accept service and appear generally.   Plaintiffs sought a stay from the Appellate Division, but their application was opposed and denied, apparently on the ground that compliance within the 90-day period would not entail hardship.   Having no alternative, plaintiffs instituted a suit in California and called for acceptance of service of process.   There of course was no intention to abandon the pending appeal, but nonetheless defendants urge the appeal should be dismissed, relying upon the principle involved in *In re Mortgage Guaranty Corporations' Rehabilitation Act,* 137 *N. J. Eq.* 193 (*E. & A.* 1945).

We find no merit in the motion.   In no realistic sense can it be said plaintiffs accepted the benefit of the judgment.   Rather, plaintiffs sought to avoid its effect and started the California action to preserve their claims, should the judgment be affirmed after the expiration of the 90-day period.   If the judgment in so many words had provided that plaintiffs must choose between an appeal and a right to sue in California, its arbitrariness would be plain.   Yet such is precisely the meaning which defendants ask us to

give it. Plaintiffs were entitled both to appeal and pro-
visionally to institute the new suit. The motion to dismiss
is accordingly denied.

## II.

We proceed to the merits of the appeal. The factual
narration is, of course, solely for present purposes and
should not be viewed as findings for the purpose of trial.

William J. Starr died a resident of Wisconsin on Decem-
ber 12, 1921. By his will, there probated, he created a
trust for a period of years for the benefit of his widow and
six children. The *res* included lands in Wisconsin, Mich-
igan and California, as well as sundry personal properties.
The bulk of the assets being non-liquid, claims against the
estate of some $300,000 could not be satisfied. In 1936,
as the terminal date of the testamentary trust approached,
the beneficiaries retained defendant, Raymond H. Berry, a
member of the New Jersey Bar, upon an agreement to pay
him 10% of the ultimate yield to them.

Berry achieved a solution. The claims were reduced to
about $144,000, secured by a mortgage to a trustee. To
provide the cash to meet the mortgage, measures had to
be taken to liquidate decedent's holdings in timberlands
in Shasta County, California. They consisted of 320.9 acres
in fee, an undivided 7/16th interest in 12,383.70 acres,
an undivided ½ interest in 400 acres, and an undivided
5/12th interest in 4,040.76 acres. The co-owners were Red
River Lumber Company of California, U. Morgan Davies
of Wisconsin, and E. Kent Swift of Massachusetts.

Swift was willing to participate in a solution if the Starr
heirs combined their interests to permit united action on
their behalf. To that end Berry prepared a trust agreement
dated July 15, 1937, whereby the widow and the Starr chil-
dren constituted Lester A. Johnston of Paterson, New Jersey,
the trustee (Johnston died in 1954 and his executrix is a
party defendant). Two of the children then lived in New
Jersey, one in Massachusetts, one in California, and two

and the widow in Maryland. (As of the time of suit, the Starr children lived in Maryland, Virginia and Florida and had succeeded to the widow's interest upon her death). The trust agreement provided:

"The Trust hereby created shall be deemed a New Jersey trust and shall in all respects be governed by the laws of the State of New Jersey."

It further provided that "as a matter of good faith, the Trustee is required to consult in all matters with the counsel for the Trustors and said Trustee shall be under no liability for any loss arising from any action taken or omitted to be taken by him at the direction of counsel for the Trustors." It seems clear that Berry was intended for the role of counsel for the trustors. He in fact served as counsel for both Johnston, the initial trustee, and defendant, John J. McCue, who succeeded Johnston in 1954 upon the latter's death. The trust had its office in Berry's office at Newark, and over the years Berry prepared the annual reports of the trustee and received compensation for service as counsel for the trustee. Plaintiffs allege that Berry in fact was the dominant figure in the administration of the trust, in their words, a *"de facto* trustee."

On April 15, 1938, as part of the overall program, a "stumpage contract" was made by Johnston and the three co-owners of the timberlands with George A. Scott and John Fossett, whereby the latter undertook to cut and pay for specified merchantable timber at prescribed rates and times. The success of the plan depended upon adequate milling facilities to be furnished by Scott and Fossett. On April 23, 1938 Johnston, as trustee, Swift and Davies entered into an "agency contract" with Berry whereby Berry agreed to act as agent to supervise the performance of the stumpage contract, he to be paid 15% of the gross amount received under the stumpage contract and from other exploitations of the holdings.

Scott and Fossett soon ran into financial difficulties. To salvage the situation, Berry induced Swift and one Coolidge

to invest moneys to complete the Scott mill. To that end the defendant, Scott Lumber Company, Inc., was formed as a corporation of New Jersey in 1938. Berry handled the incorporation and received 125 shares of the initial issue of 1,500 shares for his services. The stumpage contract was transferred to the company, Scott receiving 750 of the shares. Scott left the company in 1939 and a Mr. Moore came in to manage it. In 1942 Moore severed his connection, whereupon Swift, who by then had furnished substantial sums, induced Berry to give up the practice of law and devote full time to the operation of the Scott company. In 1946 Berry acquired an additional 125 shares by purchase from Coolidge.

To summarize Berry's situation at this juncture, he was or had been attorney for the Starr heirs (Berry contends his representation ended with the mortgage to the trustee for the creditors of the decedent in 1937); he was counsel for the Starr trustee, and according to plaintiffs the trustee in fact; he was agent for three of the four co-owners to supervise the performance of the stumpage contract; he was a director, officer and general manager of the Scott company which held the stumpage contract, and as well a stockholder, with 250 shares of the total issue which apparently at some point was reduced to 915. It is this aggregation of interests which underlies plaintiffs' claim that Berry violated fiduciary obligations.

We turn now to a summary of the issues in the litigation.

The first count attacks the sale to the Scott company in 1955 of the Starr interest in the timberlands and stumpage contract. By 1954 it became apparent, in Berry's words in a letter of August 20, 1954 to his employers under the agency contract, "that a legal attack may be made upon all past Agency transactions." Plaintiff, Nathan Starr, had indicated dissatisfaction. The same letter stated that Nathan's attorney said "he felt that I [Berry] had been involved in too many contradictory positions of trust," and suggested Berry find a purchaser for Nathan's interest. Berry concluded his letter by saying, "I do not care to

continue in a fiduciary capacity where I am deliberately threatened with a law suit, even though I do not feel that that law suit has any merit whatsoever." We gather that California counsel for the Scott company shortly thereafter questioned the continuation of Berry's several roles. At any rate, since over the years the Starr heirs had proposed sale of their interests, the Scott company in the summer of 1955 came forward with an offer. All of the Starr heirs, except Nathan, expressly agreed to the sale, and Nathan accepted his share of the proceeds, saying he did so without prejudice. Plaintiffs charge the selling price was $1,225,677.34 less than actual value.

The difference in valuation is due in part to the circumstance that the Scott company assumed the continued validity of the stumpage contract, whereas plaintiffs' expert valued the interests free of the contract, presumably because plaintiffs assail the contract as improvident when made and contend also that it should have been cancelled for alleged violations.

The second count pursues the mentioned attack upon the stumpage contract and alleges it should have been cancelled in the period 1938-1941 because of the operator's failure to make timely payments. It asserts that the difference between what was paid and should have been paid "under a full and fair price" during the period 1938-1954, was $547,152.

The third count challenges a transaction in 1941 whereby arrearages of $21,332.44 under the stumpage contract were settled for $6,000.

The fourth count attacks a supplemental contract of March 18, 1941, whereby the Scott company's obligation to bear the entire cost of fire-fighting on the agency lands was modified to place a portion upon Johnston, as trustee. In passing we note defendants say the Scott company in fact paid the entire cost notwithstanding the modifying agreement.

The fifth count alleges that in 1945 Johnston sold to Swift the Starrs' interest in 3610-5/6th acres of cut-over

land for $1 per acre, and that thereafter a settlement was made for the further sum of $8,000, represented to be an adjustment of a controversy as to whether virgin white fir was included in the sale. Plaintiffs attack the sale and the settlement.

The sixth count questions a sale of all standing cedar to the Red River Lumber Co. for $0.50 per thousand board feet pursuant to the agreement of April 15, 1938, whereby the Red River company joined in the stumpage contract. Defendants contend this concession had to be given to Red River to obtain its consent to the stumpage contract. Plaintiffs charge, additionally, that Berry failed to enforce the time provisions of the contract as amended in 1941; that in 1947, after the Scott company purchased the cedar from Red River, Johnston improperly discharged the contract for an inadequate sum.

The seventh count attacks an exchange in March 1955 of agency lands and timber for lands and timber of Ralph L. Smith Lumber Co. Defendants say the exchange was fair, made after full disclosure to all parties and to accomplish the business purpose of acquiring timber of equal value with easier access and greater fire control.

The eighth count seeks to recover all payments made to Berry for his services (a) as attorney in the Wisconsin estate matter, (b) as attorney for Johnston and McCue, trustees, and (c) as agent under the agency contract, because of excessiveness and "divided loyalty and duality of interest and duty."

The ninth count runs against McCue and seeks a return of $7,225 paid to him as commissions under the trust agreement and his removal as trustee pursuant to the terms of the agreement whereby any of the trustors could call for his resignation and the substitution of a new trustee.

The tenth count attacks a series of relatively small disbursements made by Berry, Johnston and McCue between 1938 and 1954 and charged to the trust.

The eleventh count embraces all of the matters alleged in the first seven counts, and adds a charge of conspiracy to

defraud plaintiffs and to breach the trust obligations, for which Berry, Johnston's estate, McCue and the Scott company are asked to respond.

In general, defendants assert the various transactions were proper and in good faith; that full disclosure was made to plaintiffs; that they acquiesced and approved; that in 1950 they executed releases in lieu of a formal accounting; that in 1954 they released the executrix of Johnston; that releases were again executed in 1955 by all of the Starr heirs, except Nathan, at the time of the sale of the Starr interests; and that plaintiffs are estopped. Plaintiffs reply that the consents and releases were induced by fraud and coercion. Defendants also plead the California statute of limitations. By amendment to the motion to dismiss on the ground of *forum non conveniens,* a motion was added to dismiss for failure to join "an indispensable party," Crocker First National Bank of San Francisco. The additional ground involves the circumstance that the bank, which furnished the funds for the purchase of the Starr interests, insisted upon and received the 1955 releases mentioned above. The trial court did not ground its judgment upon this additional contention, and we note in passing that we do not find the bank's presence in any way indispensable. Its interests of course could not be affected by a judgment here.

## III.

From the foregoing, it is clear that plaintiffs cannot be charged with bad faith in suing in New Jersey. The trust agreement was executed in this State and in the agreement the parties selected New Jersey as the forum for enforcement of the trust obligations. A New Jersey trustee was appointed. A New Jersey attorney was engaged to serve in the unusual role provided in the trust agreement as quoted above. When Johnston died and a resident of Watertown, New York, was suggested to succeed him, Berry urged the trustee should be a resident of New Jersey because the trust had its offices here, and McCue was thereupon selected.

Three of the four owners signed the stumpage contract in this State. The agency agreement was executed here. Most (perhaps all) of the trustee's acts were performed in New Jersey. Neither the Johnston estate nor McCue could be served in California. Berry still had some roots in this State, having continued his office in Newark notwithstanding that in 1942 he had transferred his residence to California. The Scott company is a corporation of this State, with offices in Newark, although its business activities are in California. The trust records are in Newark. The negotiations with respect to the sale of the Starr interests to the Scott company took place in Newark and New York City, and the trustee executed the deed in Newark. Some of the vital meetings which figure largely on the issues of fraud, non-disclosure, consent, and the validity of the releases, occurred in Newark and elsewhere along the eastern seaboard.

In 1950 Berry had offered to account for himself and Johnston in the Superior Court of this State, and again expressed his intention so to do in 1954. Berry voluntarily appeared in this case, and all defendants filed their answers without raising the issue of *forum non conveniens*. Voluminous depositions were taken. Various motions were made. It was not until 11½ months after the complaint was filed that the Scott company moved to dismiss, in which motion the other defendants joined, offering to appear in a suit in California. It is true the time hiatus is not necessarily decisive, but it does favor plaintiffs. Finally, plaintiffs are beneficiaries. It would take a most extraordinary showing to sustain a plea by fiduciaries that their beneficiaries should pursue them 3,000 miles away after they had agreed to respond locally.

The doctrine of *forum non conveniens* has received intensive consideration in recent years. A variety of views has emerged. See *Annotation, 48 A. L. R. 2d 800* (1956). In its early form, the doctrine seems to have been limited to foreign causes of action involving nonresident litigants, and usually then only when a plaintiff's purpose was to

harass by choice of a distant forum or to obtain recoveries exceeding those at the natural site of the controversy. The present tendency is to avoid a rigid formula and to weigh sundry factors, private and public, which bear upon the justness of a plaintiff's choice. But emphasis continues upon the element of harassment and vexation notwithstanding reference also to the element of trial convenience. *Gore v. United States Steel Corp.,* 15 *N. J.* 301, 306 (1954), quoting from *Gulf Oil Corp. v. Gilbert,* 330 *U. S.* 501, 67 *S. Ct.* 839, 91 *L. Ed.* 1055 (1947); *Braucher, "The Inconvenient Federal Forum,"* 60 *Harv. L. Rev.* 908, 930 (1947). In the adjustment of the element of harassment with the concept of trial convenience, there has emerged the principle that plaintiff's choice may not be defeated upon a mere balance of conveniences. *United States v. National City Lines, Inc.,* 334 *U. S.* 573 at *page* 589, *note* 35, 68 *S. Ct.* 1169 at *page* 1178, 92 *L. Ed.* 1584 (1948); Braucher, *supra* (60 *Harv. L. Rev.,* at 910). On the contrary, "unless the balance is strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed," and hence "an action by or against a resident will ordinarily not be dismissed," and will be dismissed "only in those exceptional cases where a weighing of all of the many relevant factors, of which residence is but part, decisively establishes that there is available another forum where trial will best serve the convenience of the parties and the ends of justice." *Gore, supra,* 15 *N. J.* at *pages* 306, 311.

In *Gore,* all the pertinent elements coincided in Alabama. The sole contact with New Jersey was that defendant, engaged in business in Alabama and there available for service, happened also to have been incorporated here. And in *Vargas v. A. H. Bull Steamship Co.,* 44 *N. J. Super.* 536 (*Law Div.* 1957), affirmed 25 *N. J.* 293 (1957), Puerto Rico was the place of accident and residence of plaintiff, while New Jersey was merely defendant's state of incorporation. *Vargas* differed from *Gore* in that defendant was not amenable to personal service in Puerto Rico. Defendant, however, promptly offered to submit to suit in Puerto Rico

and its motion was granted. In both *Gore* and *Vargas,* the other forums were equally convenient for both parties, and in fact more convenient for both than was New Jersey. And in *Vargas,* where plaintiff's choice of New Jersey was proper because defendant was not subject to process in Puerto Rico, we were careful to avoid hardship to plaintiffs, and hence conditioned dismissal upon defendant's absorbing the counsel fees plaintiffs incurred in this State.

In the present case defendants claim the evidence is more accessible in California than in New Jersey. This is obviously true with respect to some issues, but not as to others. Insofar as timber operations and expert testimony are involved, California is the source of the proof. On the other hand, with respect to the important issues of misrepresentation, non-disclosure, consent, release, and estoppel, most of the witnesses are in New Jersey or along the Atlantic seaboard. Plaintiffs say they need 25 witnesses from the East.

It is difficult to determine the relative amounts of proof on the West and East Coasts, and we doubt that any one will know until the pretrial process is completed. The complaint is broad and sweeping. We have the impression that when the preliminaries are over, the issues will be much narrowed. At the present time, both sides are speculating with respect to the West Coast evidence. In part the uncertainty is due to the narrow position plaintiffs took with respect to defendants' right to know the basis of the claim that the Starr interests were worth $1,225,677.34 more than was paid. Plaintiffs base their figure upon their expert's appraisal. The report itself was furnished to defendants, but plaintiffs would not reveal the underlying data. Such data must be furnished if the parties are to be prepared in advance of trial to meet the other's proof. Our practice embraces the thesis that parties should know their case before they try it. To that end, our rules permit full discovery, and the pretrial conference is designed to compel it. The provisions of *R. R.* 4:16–2 with respect to reports of experts are subordinate to the primary principle that a party is entitled to know everything he needs to enter

the courtroom prepared to meet the adversary's case. There is no other way to prevent surprise. At the oral argument before us plaintiffs agreed to submit that information to defendants. We are satisfied that proper discovery and a searching pretrial conference will greatly limit the records and witnesses needed for the actual trial.

It should be added that the trial court can control pretrial investigation to avoid unreasonable interruptions of the operations of the Scott company, and that since the case will be tried without a jury, the court can grant appropriate continuances to meet unexpected developments at trial. Hence, much of the claimed hardship can be obviated.

Defendants also urge that a judge of California is better able to understand the proofs because of prior experience with the problems and practices of the timber industry. We do not doubt that this is so, but on the other hand, lawyers and judges are constantly exposed to technical situations which are new to them. We are confident that our judges will have no unusual difficulty in comprehending expert testimony with respect to timber practices and customs and such local laws as may apply. Nor do we see any substantial need for a view of the lands. They constitute a tremendous area, so much so that an actual view would hardly add to the visual aids. And that a judgment for plaintiffs may not be collectible in New Jersey may not be advanced by defendants as a ground for dismissal.

Although we feel the disadvantages to defendants are less than claimed, yet we agree defendants would find a trial in California much more convenient. On the other hand, a shift of the forum would inconvenience plaintiffs and indeed impose a hardship upon them. Witnesses they need are on the East Coast. They may induce them to travel to New Jersey but not to California. Present counsel for plaintiffs have lived with the case; have had innumerable conferences with their clients and others; have participated in extensive depositions; and have acquired intimate knowledge of the facts and issues. That knowledge cannot be transferred to California counsel. Plaintiffs would have the imposing

burden of pretrial communication with California attorneys, and as well the heavy financial outlay of maintaining themselves and key witnesses at a distant place. Their economic situation is not sturdy, and it is possible that an affirmance of the judgment would ultimately end this case without a hearing on the merits. Present counsel for plaintiffs estimate the value of their services to date at $35,000. In *Vargas* we conditioned dismissal upon payment of counsel fees. If we did the same here, there would still remain the other elements of hardship, not involved in *Vargas*. Defendants do not offer to underwrite the difference in cost to plaintiffs between a trial in New Jersey and a trial in California, and we think it impracticable to attempt so to condition a dismissal of the suit.

■ Where the forum is selected in good faith upon the many contacts with it described above, and where the sources of proof on some of the substantial issues are in or closer to New Jersey than to the other available forum, a claimant's choice should not be denied on a mere weighing of relative conveniences. It is not enough that a defendant will be seriously inconvenienced; it must also appear that a transfer will not result in significant hardship to the plaintiffs. So tested, defendants' motion should have been denied.

■ The test should be thus exacting. Today many transactions, commercial and tortious, have evidential roots in several jurisdictions. The controlling test should be practicable as well as inherently just. The doctrine was originated to prevent harassment of a defendant; it should not now be used offensively to embarrass or destroy a claimant's opportunity to be heard. Moreover, if only a weighing of the relative conveniences were involved, motions to dismiss would become the usual thing in all such cases, thus diverting the energies of counsel and the courts to quarrels over venue considerations; and indeed a case might be shuttled between jurisdictions upon discordant determinations of the preponderance, especially where the prospect of a lengthy trial offers a strong temptation to decline to entertain the suit.

We should comment briefly upon several further considerations defendants have advanced. They say, and the trial court agreed, that the taxpayers of this State should not be burdened with this litigation. The effect upon local calendars is usually noted in discussions of the doctrine. *Gore v. United States Steel Corp., supra,* 15 *N. J.* at *page* 306. In *Sielcken v. Sorenson,* 111 *N. J. Eq.* 44 (*Ch.* 1932) and *Anderson v. Delaware, L. & W. R. Co.,* 18 *N. J. Misc.* 153 (*Cir. Ct.* 1940), reference was made to this consideration, but as in *Gore,* the result in fact reflected a determination upon the factors which concerned the litigants; the element of cost to the State did not constitute an ingredient in the solution. In *Weed v. Smith,* 15 *N. J. Super.* 250 (*App. Div.* 1951), in which the parties were residents of Connecticut and the accident there occurred, the Appellate Division held the defendant should not be permitted to move to dismiss since he voluntarily had arranged for service upon himself in New Jersey, and concluded also that in the circumstances (the statute of limitations had run in Connecticut) the court should not itself raise the objection. We do not express agreement or disagreement with that case. We refer to prior decisions in this State to indicate that the taxpayer's interest is more a reason for the existence of the doctrine than an operative fact in determining whether to apply it in a given case. We incline to the view that if as between the litigants justice dictates that plaintiff's choice of forum be upheld, such should be the result notwithstanding its impact upon the economy of the judicial system. *Barrett, "The Doctrine of Forum Non Conveniens,"* 35 *Calif. L. Rev.* 380, 404–09 (1947).

Defendants also assert that the trust relates to foreign land and hence this suit falls within *section* 243 of the *Restatement, Conflict of Laws* (1934):

"The administration of a trust of land is governed by the law of the state where the land is and can be supervised by the courts of that state only."

The trust agreement is a trust of land in California. But the agency agreement is not. Nor does the charge of violation by Berry of his fiduciary duties, nor the charge of conspiracy by defendants to defraud and to procure violations of fiduciary duties, fall within the ambit of *section* 243. At any rate, that section is one of several which reflect the basic concept that legal and equitable rights in real property shall be adjudged at the situs. *Cf. Fidelity Union Trust Co. v. Ackerman,* 123 *N. J. Eq.* 556 (*E. & A.* 1938). Thus the design of *section* 243 is to avoid foreign interference with the internal management of trusts of local lands. Here, however, plaintiffs do not seek to disturb title to the California realty, or to direct any course of action with respect to a going trust. Rather, they recognize the disposition of the lands to be an accomplished fact, and seek money damages from the alleged malefactors. The broad principle that only local courts shall adjudge title to lands has never been understood to foreclose specific relief elsewhere when the court can enforce its judgment *in personam.* See 1 *Beale, Conflict of Laws* (1935), § 97.4, *p.* 420; *Goodrich, Conflict of Laws* (3d ed. 1949), § 151, *p.* 463; *Restatement, Conflict of Laws,* § 239, *comment b;* § 240, *comment a;* § 243, *comment c* (1934); *Vreeland v. Vreeland,* 49 *N. J. Eq.* 322 (*E. & A.* 1892); *Hill v. Peterson,* 323 *Mass.* 384, 82 *N. E.* 2d 11 (*Sup. Jud. Ct.* 1948). A *fortiori,* there is no difficulty when money damages are sought, at least when the claim is not a local one for injury to the property itself. 1 *Beale, Conflict of Laws,* § 97.12, *p.* 430 (1935); *Wood v. Warner,* 15 *N. J. Eq.* 81 (*Ch.* 1862); *Irving Trust Co. v. Maryland Casualty Co.,* 83 *F. 2d* 168 (2 *Cir.* 1936), *certiorari* denied 299 *U. S.* 571, 57 *S. Ct.* 34, 81 *L. Ed.* 421 (1936). The question whether New Jersey or California law applies to the various facets of this case is something else. *Cf. Goodrich, Conflict of Laws* (3d ed. 1949), § 149, *p.* 458. It is not suggested that there is any difference between the states concerning the nature of a fiduciary's obligation, or that there is such difficulty in handling the California statute of limitations or

local laws relating to forestry practices as would constitute an independent basis for sending the entire controversy to California.

The judgment is accordingly reversed.

JACOBS, J., concurring in result.

*For reversal*—Chief Justice WEINTRAUB, and Justices HEHER, BURLING, JACOBS, FRANCIS and PROCTOR—6.

*For affirmance*—Justice WACHENFELD—1.