819 A.2d 431 (2003)
359 N.J. Super. 135
BOC GROUP, INC., Plaintiff-Respondent,
v.
CHEVRON CHEMICAL COMPANY, LLC, Defendant-Appellant.
Superior Court of New Jersey, Appellate Division.
Argued February 19, 2003.
Decided April 3, 2003.
*433 Joseph P. La Sala argued the cause for appellant (McElroy, Deutsch & Mulvaney, Morristown, attorneys; Mr. La Sala, of counsel; Nancy McDonald and George A. Kelman, Roseland, on the brief).
*434 Michael L. Rosenberg, Trenton, argued the cause for appellant (Sterns & Weinroth, attorneys; Mr. Rosenberg, of counsel; Marshall D. Bilder and Christopher E. Torkelson, on the brief).
Before Judges SKILLMAN, CUFF and WINKELSTEIN.
*432 The opinion of the court was delivered by WINKELSTEIN, J.A.D.
Plaintiff contracted with defendant to deliver liquid nitrogen, primarily from its Michoud, Louisiana plant, to defendant's oil refinery production facility located in Belle Chase, Louisiana. Defendant uses liquid nitrogen to ensure the safe operation of its plant. Defendant claims that plaintiff repeatedly failed to timely deliver the liquid nitrogen, dropping the liquid nitrogen to dangerously low levels, compromising the safety of plant personnel. Although the contract provided that if plaintiff failed to deliver the liquid nitrogen as required defendant's sole remedy would be to purchase the product from another supplier and charge plaintiff for the additional expenses incurred, defendant did not do so, but instead terminated plaintiff's services.
Plaintiff sued defendant for breach of contract, and defendant counterclaimed. Each sought damages. The Law Division granted plaintiff's motion for partial summary judgment on liability, and defendant agreed to dismiss its counterclaim. After a damages trial before a jury, plaintiff was awarded a judgment in the amount of $1,200,000.
Defendant appealed, challenging the Law Division's denial of its motion to dismiss the complaint on the grounds of forum non conveniens; its grant of summary judgment on the issue of liability; and various evidentiary rulings at the damages trial. We conclude that defendant's arguments are without merit. Accordingly, we affirm.

I
Plaintiff is a Delaware corporation that produces liquid nitrogen. Its principal place of business is in Murray Hill, New Jersey, with a regional office in Houston, Texas. Defendant, also a Delaware corporation, has its principal place of business in San Francisco, California.
On October 1, 1991, the parties entered into a procurement contract, whereby plaintiff would supply defendant with "[a]ll [of defendant's] requirements" for bulk nitrogen. Plaintiff would deliver the nitrogen by tank trucks to Chevron's Oak Pointe Plant in Belle Chase. The contract, prepared and executed by defendant in California, was originally effective from October 1, 1991, to September 30, 1994, and was extended until August 31, 2000.
Defendant uses liquid nitrogen to "prevent fires and explosions within process equipment and systems and to assure instrumentation and control system reliability in critical process units." The nitrogen "protects plant personnel and the public from accidental toxic material discharges and prevents product contamination [from] oxygen ... which would reduce product quality and performance." More specifically, nitrogen is used to regulate the oxidation of petrochemicals (oil). Many petrochemicals at defendant's plants are maintained at high temperatures, and to keep them from quickly oxidizing, defendant keeps a nitrogen purge in the petrochemical tanks. If the nitrogen purge is not sustained, oxygen quickly enters the tank and whatever build-ups of petrochemicals which may have otherwise oxidized slowly, will oxidize quickly, resulting in an explosion. Defendant also uses nitrogen *435 "as a control substance for processes that produce nitrogen sulfide, ... a very deadly gas," which needs to be "managed very carefully."
The contract was a "requirement" contractdeliveries were based on how much liquid nitrogen defendant had in its tanks. As a result, plaintiff typically made deliveries seven days a week, and sometimes several times a day.
Under the contract's terms, defendant's exclusive remedy if plaintiff failed to timely deliver the nitrogen was "cover damages."
(B) CHEVRON'S EXCLUSIVE REMEDY FOR THE UNEXCUSED FAILURE ON THE PART OF SUPPLIER TO DELIVER PRODUCT TO CHEVRON WHEN REQUIRED HEREUNDER, WHETHER OR NOT SUCH FAILURE WAS CAUSED, IN WHOLE OR IN PART, BY ANY NEGLIGENCE, SHALL BE TO RECOVER FROM SUPPLIER THE DIFFERENCE BETWEEN THE COST TO PURCHASER OF ANY REASONABLE PURCHASE OF PRODUCT IN SUBSTITUTION FOR THE PRODUCT THAT [BOC] SO FAILED TO DELIVER AND THE LESSER PRICE OF SUCH QUANTITY OF PRODUCT HEREUNDER, REDUCED BY ANY EXPENSES SAVED BY CHEVRON.
When the nitrogen level fell below fifty percent of the total storage capacity, the operator of defendant's plant would inform plaintiff that the levels were depleting and check on the time for the next delivery. At a twenty-five percent level of nitrogen, defendant considered the situation "critical," and at a ten-percent level defendant could no longer maintain normal operation of the plant.
Defendant claims that from August 1997 through June 1998 plaintiff made twenty-one late deliveries. A representative of defendant stated that on "many more than two times," because of its dissipating nitrogen levels, defendant's personnel would have to call plaintiff to find out when the next delivery would arrive. Plaintiff would usually promise delivery within four hours; however, the delivery would typically not arrive for as long as twelve hours. On May 19, 1998, defendant's nitrogen supply became so low that it had to connect its own nitrogen cylinders to the hot oil surge tank to maintain operation.
That same month, Steven Earle, defendant's operations supervisor, decided to terminate the contract with plaintiff and find another liquid nitrogen supplier. He testified that he opted to terminate the contract rather than seek cover damages because he could not find alternate suppliers to deliver the required nitrogen. He claimed other suppliers were hesitant "to come in and infringe on an existing contract,..." He did not know, however, which suppliers interpreted the contract that way. Although he believed that Air Products, a company that delivered nitrogen to defendant's other plants, as well as other chemicals to defendant's Belle Chase plant, "would have been one of them," Dennis H. Boushie, an Air Products representative, testified otherwise. He said that in early 1998, when a representative of defendant told him of defendant's problems with low nitrogen inventory levels, he represented that Air Products "had the product" and could supply the product to defendant. Allen Jackson, defendant's purchasing manager, confirmed this conversation. Although no agreement materialized from the discussion, Air Products did cover defendant's liquid nitrogen supply on one occasion, in September 1998 during a hurricane.
Earle also acknowledged, however, that when he made his decision to terminate *436 the contract in May 1998 he was not aware of the exclusive remedy provision in the contract. In fact, he had not read the contract. When asked what he thought the parties "envisioned" when the contract was drawn concerning what Chevron would do if BOC failed to supply sufficient amounts of nitrogen, Earle did not know.
In July 1998, defendant advised plaintiff that because of its supply problems it intended to change suppliers. On July 15, 1998, plaintiff and defendant met to discuss plaintiff's performance under the contract. At the meeting, Earle asked plaintiff for a letter confirming that defendant could obtain nitrogen from a secondary supplier. Plaintiff agreed to do so, but never followed through.
On August 25, 1998, defendant wrote to plaintiff explaining that plaintiff's late deliveries jeopardized defendant's plant's operations. Enclosed with the letter was a proposed amendment to the contract, which essentially allowed defendant to obtain nitrogen from any supplier, not just plaintiff. The effect of the amendment would have been to terminate the contract.
Plaintiff agreed to maintain defendant's supply of liquid nitrogen at a forty-percent level, and plaintiff also offered to "[p]rovide and install [at defendant's plant] an additional 11,000 gallon vessel at no cost, to increase the present nitrogen storage from 22,000 to 33,000 gallons." Defendant declined the offer. Rather, in a September 1, 1998, letter, defendant said, "Effective October 1, 1998, Chevron's demand for liquid nitrogen from BOC will be terminated."

II
We first address the denial of defendant's motion to dismiss the complaint based upon the doctrine of forum non conveniens. "[T]he essence of the doctrine is that a court may decline jurisdiction whenever the ends of justice indicate a trial in the forum selected by the plaintiff would be inappropriate." D'Agostino v. Johnson & Johnson, Inc., 225 N.J.Super. 250, 259, 542 A.2d 44 (App.Div. 1988), aff'd, 115 N.J. 491, 559 A.2d 420 (1989). When deciding whether to dismiss a complaint for forum non conveniens, the principal focus is whether the choice of forum presents an "element of harassment and vexation." Starr v. Berry, 25 N.J. 573, 584, 138 A.2d 44 (1958). Dismissal of a complaint is unwarranted unless the plaintiff's choice is shown to be "demonstrably inappropriate." Civic S. Factors Corp. v. Bonat, 65 N.J. 329, 333, 322 A.2d 436 (1974). "Consequently, a plaintiff's choice of forum ordinarily will not be disturbed except upon a clear showing of real hardship or for some other compelling reason." Ibid.
In contract actions, a court will not disturb a plaintiff's selection of forum except in the most exceptional circumstances because contract actions have "evidential roots in several jurisdictions." Starr, supra, 25 N.J. at 587, 138 A.2d 44; see Waste Mgmt. v. Admiral Ins. Co., 138 N.J. 106, 125, 649 A.2d 379 (1994); D'Agostino, supra, 225 N.J.Super. at 261, 542 A.2d 44; Amercoat Corp. v. Reagent Chem. & Research, Inc., 108 N.J.Super. 331, 347, 261 A.2d 380 (App.Div.1970).
A court must evaluate both public and private interest factors to determine if a plaintiff's choice of forum is appropriate. Kurzke v. Nissan Motor Corp. in U.S.A., 164 N.J. 159, 165, 752 A.2d 708 (2000). These factors include the imposition of jury duty on members of a community, the local interest in the subject matter and "in having localized controversies decided at home." D'Agostino, supra, 225 N.J.Super. at 263, 542 A.2d 44 (quoting Gulf Oil Corp. v. Gilbert, 330 U.S. 501, 508-09, 67 S.Ct. *437 839, 843, 91 L.Ed. 1055, 1062-63 (1947)). Private interest factors include relative ease of access to sources of proof, availability of witnesses, whether a view of the premises is necessary, and other practical problems. Ibid.
However, even after examining the private and public interest factors, a plaintiff's choice of forum should not be disturbed, "unless the balance is strongly in favor of the defendant." Gulf Oil, supra, 330 U.S. at 508, 67 S.Ct. at 843, 91 L.Ed. 1055 at 1062. A "plaintiff's choice may not be defeated upon a mere balance of conveniences." D'Agostino, supra, 225 N.J.Super. at 262, 542 A.2d 44.
Because the principles of forum non conveniens are equitable in nature, we apply the abuse of discretion standard of review to the trial court's decision denying defendant's motion to dismiss the action on forum non conveniens grounds. Paradise Enters. Ltd. v. Sapir, 356 N.J.Super. 96, 102, 811 A.2d 516 (App.Div.2002). In doing so, we conclude the Law Division did not abuse its discretion.
The case arose from a contract dispute, warranting the court's deference to plaintiff's choice of forum. In addition, plaintiff's contacts with this state support the conclusion that plaintiff's choice of forum did not present an element of "harassment and vexation." Plaintiff has its headquarters in New Jersey, employing over 1500 people. The billing and delivery orders of the procurement contract with defendant were processed out of this office. Furthermore, plaintiff's expert witness, Robert Brown, works and lives in New Jersey.
Defendant has an office in Voorhees, New Jersey. Both parties are organized under the laws of Delaware, and plaintiff has its National Scheduling Center, the control center of all the orders and deliveries for its plants in the United States, in Bethlehem, Pennsylvania. Based upon these facts, we do not find that plaintiff's choice of New Jersey as the forum was "demonstrably inappropriate."
Nor do a balance of the public and private interests strongly favor defendant. See Gulf Oil, supra, 330 U.S. at 508, 67 S.Ct. at 843, 91 L.Ed. at 1062-63. New Jersey has a strong interest in hearing the case since plaintiff has its corporate headquarters and employs over 1,500 people in this state. As a contract case, much of the evidence consisted of documents such as letters and proposals between the parties, which plaintiff kept either in its New Jersey office or at its National Scheduling Center. Nor was a visit to the site necessary.
Defendant argues that because both plaintiff's and defendant's plants are located in Louisiana, that state provided an alternative and adequate forum. It may have. But that is not the test. The doctrine of forum non conveniens does not search for the most convenient forum. Rather, the doctrine is directed at preventing plaintiffs from harassing defendants by their choice of forum. Starr, supra, 25 N.J. at 584, 138 A.2d 44. As we stated earlier, a plaintiff's choice of forum will not be disturbed "except upon a clear showing of real hardship or for some other compelling reason." Civic S., supra, 65 N.J. at 333, 322 A.2d 436. Defendant has not made such a showing. We find no abuse of discretion by the Law Division.

III
We next turn to the Law Division's entry of summary judgment on liability. The judge relied on the exclusive remedy language of the contract, limiting defendant's rights in the event plaintiff failed to deliver nitrogen at the times and *438 in the quantities defendant required. The court found that defendant's sole remedy in the event of plaintiff's noncompliance with the contract was to purchase nitrogen from another supplier, and charge plaintiff for any additional expense defendant incurred by reason of plaintiff's untimely deliveries. The court concluded that defendant did not have the right to terminate the contract. We agree.
Under the Uniform Commercial Code (U.C.C.) as adopted in New Jersey, parties to a contract may establish an exclusive remedy, which, if so labeled, "is the sole remedy" available to them under the terms of the contract. N.J.S.A. 12A:2-719(1)(b). Yet, despite this exclusive remedy provision, "[w]here circumstances cause an exclusive or limited remedy to fail of its essential purpose, remedy may be had as provided in [the U.C.C.]." N.J.S.A. 12A:2-719(2). The exclusive remedy provision is "`not concerned with arrangements which were oppressive at their inception, but rather with the application of an agreement to novel circumstances not contemplated by the parties.'" White & Somers, Uniform Commercial Code, (4th Ed.1995), § 12-10 at 660 (quotation omitted); see also Roneker v. Kenworth Truck Co., 944 F.Supp. 179, 184 (W.D.N.Y.1996) ("A remedy fails in its essential purpose when, while it may have appeared fair and reasonable at the inception of the contract, as a result of later circumstances it operates to deprive a party of a substantial benefit of the bargain.") Although an arm's length contract between sophisticated commercial parties, such as in this case, should not be readily upset by a court, White & Somers, supra, § 12-10 at 662, where a party is deprived of the substantial value of its bargain by reason of the exclusive remedy, the contract remedy will give way to the general remedy provisions of the U.C.C. Bishop Logging Co. v. John Deere Indus. Equip. Co., 317 S.C. 520, 455 S.E.2d 183, 191 (1995).
Issues concerning a contract's exclusive remedy often arise in the context of a breach of warranty. For example, when a product becomes defective, the breach of warranty provision may limit the seller's obligation to repair or replace defective equipment. See AMF Inc. v. Computer Automation, Inc., 573 F.Supp. 924, 927 (S.D.Ohio 1983); Lankford v. Rogers Ford Sales, 478 S.W.2d 248, 250 (Tex.Civ.App. 1972). In these types of caseswhere the seller has limited the warranty to the repair or replacement of a defective part or productbefore the exclusive remedy is considered to have failed in its essential purpose, the seller must be given an opportunity to repair or replace the product. See Palmucci v. Brunswick Corp., 311 N.J.Super. 607, 614, 710 A.2d 1045 (App. Div.1998); Gen. Motors Acceptance Corp. v. Jankowitz, 216 N.J.Super. 313, 329-30, 523 A.2d 695 (App.Div.1987); Corey v. Furgat Tractor & Equip., Inc., 147 Vt. 477, 520 A.2d 600, 601-02 (1986); White & Somers, supra, § 12-10 at 661.
A remedy may also fail of its essential purpose if, "after numerous attempts to repair," the product does not operate free of defects. Gen. Motors Acceptance Corp., supra, 216 N.J.Super. at 329, 523 A.2d 695; see also Chatlos Sys., Inc. v. Nat'l Cash Register Corp., 635 F.2d 1081, 1085-86 (3d Cir.1980) (applying New Jersey U.C.C., court concluded remedy failed essential purpose where after year and a half of trying, seller unable to correct deficiencies in computer system).
Failure of an exclusive remedy may also come about if the buyer is required to perform an act that cannot be done, such as where a warranty calls for defective parts to be delivered to its plant, but the parts were destroyed, See White & *439 Somers, supra, § 12-10 at 662-63; or repair or replacement take an unreasonable time to complete, see Chatlos Sys., supra, 635 F.2d at 1085; Beal v. Gen. Motors Corp., 354 F.Supp. 423, 427 n. 2 (D.Del. 1973); Johnson v. John Deere Co., 306 N.W.2d 231, 235 (S.D.1981); or circumstances "prevent the agreed remedy from yielding its purported and expected relief." Ritchie Enters. v. Honeywell Bull, Inc., 730 F.Supp. 1041, 1048 (D.Kan.1990).
When deciding whether an exclusive remedy has failed of its essential purpose, a court must examine "the facts and circumstances surrounding the contract, the nature of the basic obligations of the party, the nature of the goods involved, the uniqueness or experimental nature of the items, the general availability of the items, and the good faith and reasonableness of the provision." J.A. Jones Constr. Co. v. City of Dover, 372 A.2d 540, 549 (Del.Super.Ct.) (citing 2 Anderson on U.C.C., 506-512, §§ 2-719 & 9-22), appeal dismissed, 377 A.2d 1 (Del.1977).[1] Whether an exclusive remedy fails in its essential purpose is a question of fact. See Ritchie, supra, 730 F.Supp. at 1048; Alloy Computer Prods. v. N. Telecom, Inc., 683 F.Supp. 12, 15, n. 4 (D.Mass.1988); Laidlaw Transp., Inc. v. Helena Chem. Co., 255 A.D.2d 869, 680 N.Y.S.2d 365, 367 (App.Div.1998).
Here, the exclusive remedy provision of the contract limited defendant's rights in the event of plaintiff's breach. Defendant's "exclusive remedy" for the "unexcused failure on the part of [plaintiff] to deliver product to [defendant]," was defendant's right to recover from plaintiff the difference between defendant's cost to purchase nitrogen from another supplier and the price defendant would have paid plaintiff for the nitrogen under the terms of the contract. Defendant did not exercise this right because it claims it was unable to purchase nitrogen from other suppliers; therefore, defendant argues, the remedy failed in its essential purpose and may not be enforced. The proofs do not, however, support defendant's argument.
Earle testified that he believed other suppliers would not sell defendant liquid nitrogen because they did not want to "infringe" on defendant's contract with plaintiff. However, Earle was unable to point to any occasion when defendant made such a request, or to any supplier who ever turned down defendant's request. Although Earle believed Air Products may have been one of the suppliers who would not sell product to defendant, that testimony was contradicted by the testimony of Jackson and Boushie, each of whom indicated that Air Products was prepared to supply liquid nitrogen to Chevron; and, in fact, did supply liquid nitrogen to Chevron in September 1998.
Defendant's position, that the exclusive remedy failed, is further belied by Earle's testimony that at the time he decided to terminate the contract with plaintiffMay 1998he was not even aware of the exclusive remedy provision of the contract. The clear inference being that if he did not know what the contract required if plaintiff breached, there was no reason for him to invoke the contract's exclusive remedy.
We agree with the motion judge that a rational factfinder could not find that the exclusive remedy failed in its essential purpose. On the only occasion defendant actually tried to purchase nitrogen from another supplier, it was successful. The facts paint a clear picturedefendant did *440 not give the exclusive remedy an opportunity to work before terminating the contract. It made no attempt to purchase liquid nitrogen from other suppliers when plaintiff was delinquent in its deliveries. Instead, Earle canceled the contract despite the contract's exclusive remedy, which did not include termination.
Both plaintiff and defendant are sophisticated business entities, freely entering into a contract which limited defendant's remedies. We find no reason why the parties should not be held to the terms of their bargain. The evidence presented to the motion judge was so one-sided, that plaintiff must prevail as a matter of law. See Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540, 666 A.2d 146 (1995).

IV
Defendant argues that the trial court did not entertain its claim that plaintiff's repeated lateness in delivering the nitrogen was tantamount to a breach of installments, impairing the value of the contract as a whole, giving defendant the right to cancel the contract. Under N.J.S.A. 12A:2-612(1), an "installment contract" is a contract in which the goods are delivered in "separate lots to be separately accepted." Whenever a nonconformity or a default with respect to one or more of the installments "substantially impairs the value of the whole contract[,] there is a breach of the whole," N.J.S.A. 12A:2-612(3), and the nondefaulting party may cancel the contract. N.J.S.A. 12A:2-711(1). However, an "aggrieved party reinstates the contract if he accepts a non-conforming installment without seasonably notifying of cancellation or if he brings an action with respect only to past installments or demands performance as to future installments." N.J.S.A. 12A:2-612(3).
Defendant points to twenty-one occasions where plaintiff was late delivering the nitrogen. Yet, defendant continued to accept delivery, without "seasonably" notifying plaintiff of its decision to cancel the contract. In fact, it was not until well after the twenty-one allegedly late deliveries that defendant told plaintiff of its intention to cancel the contract. Even after notifying plaintiff of the problems, and meeting with plaintiff in July 1998, defendant continued to accept nitrogen from plaintiff. In other words, even if plaintiff's late deliveries were deemed to substantially impair the contract, by continuing to accept the deliveries, defendant reinstated the contract. Its argument that plaintiff's repeated late deliveries permitted cancellation is therefore without merit.

V.
[At the court's direction, section V of the opinion, which discusses various evidentiary rulings at the damages trial, has been omitted from the published version of this opinion.]
Affirmed.
NOTES
[1] The language of Delaware's U.C.C. § 2-719(2) provision contains language identical to the New Jersey provision.