Plaintiffs/Appellees Curtis G. Harrell and Diane C. Harrell initiated this cause on November 19, 1981, seeking compensatory damages from Defendant/Appellant Volkswagen of America, Incorporated. The crux of Plaintiffs' complaint was premised upon allegations of breach of a new vehicle limited written warranty by Defendant in its sale to Plaintiffs of a 1981 Volkswagen "Vanagon" camper.
Plaintiffs further demanded that attorneys' fees of "a sum equal to the aggregate amount of costs and expenses, including reasonable attorney's fees," be awarded pursuant to 15 U.S.C. § 2310
(d)(2) (1976) (Magnusson-Moss Federal Warranty Act).[1]
Volkswagen denied Plaintiffs' allegations and submitted in defense, inter alia, that the warranty issued Plaintiffs limited their recovery, if any, to "repair" or "replacement" of defective parts, if the vehicle were presented for repairs to an authorized Volkswagen dealership during its effective warranty tenure.
Prior to trial on the merits, Plaintiffs' counsel sought an order from the court that Defendant, its counsel, and any witnesses be prohibited from informing the jury that Plaintiffs, in their demand for judgment, sought an award by the court of attorney's fees, costs and expenses, in addition to their claim for damages. This motion was granted over Defendant's objection.
During the course of the trial, Plaintiff Curtis G. Harrell testified concerning his alleged conversation with an unknown employee of a Volkswagen dealership in Seattle, Washington. The purpose of this testimony was to negate Defendant's contention that Plaintiffs intentionally ignored a warning by Volkswagen personnel to "retorque" *Page 158 
the repaired engine after 1000 miles [2]. This testimony was submitted over Defendant's "hearsay" objection.
Immediately prior to the trial court's charge to the jury, Defendant sought an instruction (# 4) to the effect that the jury not consider, in its deliberations of an award, monies owed by Plaintiffs as attorneys' fees, costs and expenses.[3]
The jury returned a verdict for Plaintiffs in the amount of $10,000.[4] After an evidentiary hearing concerning attorneys' fees, costs and expenses, the trial court awarded Plaintiffs' counsel fees of $8,650.85, plus costs of $487.87, for a total award of $9,138.72. Judgment was thereafter entered against Defendant for $19,138.72.
We affirm.
 FACTS
The Harrells purchased a 1981 Volkswagen (VW) "Vanagon" camper on April 1, 1981, from Ted Avrett Volkswagen, Inc. in Enterprise, Alabama, for $14,714.20. Included in their documentation of purchase was a written warranty from Volkswagen of America, Inc., which read, in pertinent part, as follows:
 "1. VWoA warrants to the original retail customer and any subsequent purchaser that every 1981 Volkswagen vehicle imported or distributed by VWoA and sold as a new vehicle to a retail customer will be free from defects in material and workmanship for 12 months after the date of first use or delivery of the vehicle to the original retail customer or until the vehicle has been driven 20,000 miles, whichever comes first. . . .
 "2. In order to keep this warranty in effect, the owner must have the vehicle maintained and serviced as prescribed in the Volkswagen Maintenance Schedule.
". . .
 3. VWoA is not responsible for damage or malfunctions resulting from:
 "(I) misuse, negligence, alteration, accident or fire;
"(II) improper repair of the vehicle;
"(III) use of the vehicle in competitive events; or
 "(IV) failure to follow recommended maintenance requirements.
". . .
 "6. This warranty and the limited emission control system warranties for Volkswagen vehicles are in lieu of all other express warranties of VWoA, the manufacturer, the distributor and the selling dealer. Any implied warranty is limited in duration to the duration of these written warranties.
 "Neither VWoA nor the manufacturer assumes, or authorizes any person to assume, on its behalf, any other obligation or liability.
 "Some states do not allow limitations on how long an implied warranty lasts, so the above limitation may not apply to you.
 "7. VWoA is not responsible for loss of time, inconvenience, loss of use of the vehicle or other consequential damage. "Some states do not allow the exclusion or limitation of incidental or consequential damages, so this limitation or exclusion may not apply to you."
From the date of purchase in April of 1981 until mid-August of that year, the vehicle was relatively trouble-free, save for a minor oil consumption problem. This trouble was apparently rectified; and, shortly thereafter, the Harrells embarked on a camping sojourn to Washington State. While in Washington, the van lost power and subsequently quit running. Unable to locate an authorized Volkswagen representative in the immediate area, Mr. Harrell purchased and installed certain ignition parts, hoping that with these parts they *Page 159 
might reach Yakima, Washington, and the nearest authorized VW dealer. Once in Yakima, the Harrells were informed that it would be at least one and one-half weeks before the VW dealer could service his vehicle. As a result, they visited Kinetic Engineering, an "independent" garage, for a diagnostic check of their engine. This process included a timing check, as well as removal of spark plugs to measure compression. Kinetic also installed a set of points on the engine. The total charge for this service was $21.40.
After reaching Seattle, Mr. Harrell visited Freeway Volkswagen, an authorized dealership, in an effort to eradicate the trouble. Freeway kept the camper seven days, doing extensive repairs to the engine, during which time the Harrells incurred additional expenses for a replacement vehicle, food, and lodging. The service order prepared by Freeway Volkswagen bore the stamped notation "Important — Return car at 1000 miles for cylinder head retorque."
Leaving Seattle, the Harrells incurred their next major problem in Oregon, where the muffler fell off.[5] After leaving Oregon, and while the Harrells were in Arizona, the engine again commenced to lose power. This was followed by a renewed tapping noise. These were the same two problems initially experienced in Washington.
When the Harrells reached El Paso, Texas, the vehicle was again turned in to an authorized VW dealership for a period of five days. While in El Paso, Mr. Harrell was informed by the VW mechanic that improper "pushrods" had been installed in Seattle, and that this was the primary cause of his subsequent troubles.
Before trial, it was Volkswagen's contention that improper repairs (i.e., installation of pushrods) by a "non-authorized shop" in Washington State had caused the subsequent problems during the trip to El Paso. This position was expressed in certain of Volkswagen's interrogatory answers to Question Three that were read to the jury:
 "Bob Hoy Volkswagen [the WV dealer in El Paso] removed and replaced the hydraulic lifters, disassembled and cleaned them since they were contaminated from damaged pushrods which were installed by an independent non-authorized repair shop not authorized by VWoA to perform any repairs. This non-authorized shop to which the Plaintiff had taken the vehicle had installed solid lifter pushrods instead of hydraulic lifter pushrods which were the appropriate components. These parts were inappropriate being of different lengths than the authorized parts which should have been installed. As a result they were not suited for the purpose intended, and, therefore, they deteriorated and particles of the pushrods contaminated other parts of the engine."
The only "non-authorized shop" that serviced Plaintiffs' vehicle was Kinetic Engineering in Yakima, Washington. Kinetic's services included no internal work on the engine, but only compression checks, tuning, and installation of ignition parts. The only garage to have performed "extensive" repairs on the camper before it reached El Paso was Freeway Volkswagen. After leaving El Paso, the Harrells headed back to Alabama. In Troy, Alabama, the muffler fell off again. Additionally, while in this vicinity, the tapping noise reappeared and the van began to lose power. Each misfortune experienced at this point had occurred at least three times since the Harrells' original departure from Alabama.
Upon their arrival back in Ft. Rucker, Alabama (their original point of departure), Mr. Harrell returned the camper to Ted Avrett Volkswagen, Inc., in September 1981. While the vehicle was with Ted Avrett's dealership, Mr. Harrell called VW's regional manager in Jacksonville, Florida, and described his plight. Additionally, Mr. Harrell called VW's Englewood, New Jersey, home office and spoke with a customer service representative. Pursuant to VW's request, Mr. Harrell next forwarded to VW's home office correspondence detailing his recent misfortunes. In this letter, Mr. *Page 160 
Harrell enclosed service orders from each garage that had worked on the vehicle, including Kinetic Engineering, the "independent" mechanic. Mr. Harrell also indicated that his purchase of the van evolved from a desire to use it in Europe, following his proposed transfer to Germany for service in the armed forces. In response, Mr. Harrell received a letter from Volkswagen informing him of an individual "to call" upon his arrival in Germany.
The van remained with Ted Avrett Volkswagen for a week. Thereafter, in November 1981, the engine once again repeated the same "old" malfunction. Mr. Harrell next turned the vehicle in to Imperial Volkswagen, Inc., of Dothan, Alabama, on December 10, 1981, where it remained for thirteen days. From December 23, 1981, until March of 1982, the van had few problems. In March, however, those problems which occurred in Washington started all over again. As of December 23, 1981, the Harrells' van had been in four different authorized VW repair shops for a period of 33 days in a four-month period, beginning with Freeway Volkswagen of Seattle on August 13, 1981.
Doug Nielson is a product liaison specialist with Volkswagen. As such, he serves as a liaison between Volkswagen and various legal counsel representing it throughout the country. Nielson testified that in his opinion the van had "afforded Mr. and Mrs. Harrell safe, dependable transportation." Additionally, Nielson disagreed with the opinion expressed by Volkswagen's interrogatory reply that improper repairs had caused the van to break down on the trip from Washington State to El Paso. Nielson also challenged the assertion that Freeway Volkswagen in Seattle had improperly installed defective pushrods.
After filing its interrogatory answer of February 18, 1982, contending that "improper repairs" caused the breakdown on the Washington State to El Paso trip, Volkswagen superseded it with an interrogatory answer of April 7, 1982, which read in pertinent part:
 "Since in his letter to VWoA dated September 4, 1981 Plaintiff indicates that he took the vehicle to an independent mechanic in the State of Washington, it was incorrectly presumed by VWoA that the wrong pushrod tubes were installed at that time, however, in light of Plaintiffs' testimony on deposition, VWoA withdraws pending further analysis its contention that the repairs at the unauthorized repair shop resulted in damage to Plaintiffs' vehicle. This is not to say that the non-authorized repair shop is free of responsibility, but merely that previous analysis concluding that they were responsible was based on inaccurate information."
Despite Volkswagen's supplemental interrogatory reply, Nielson testified that the withdrawal of the earlier interrogatory answer did not imply that Volkswagen was admitting that it had been mistaken as to the identity of the particular garage that had installed the improper pushrods.
Mr. Harrell's letter to Volkswagen of September 4, 1981, stated that he was told in El Paso that the vehicle had been improperly repaired in Seattle (Freeway Volkswagen). Additionally, enclosed with his correspondence were service orders, including the bill of $21.40 from Kinetic Engineering, the "independent" mechanic in Yakima, Washington.
Mr. Nielson also disagreed with Volkswagen's pretrial contention that the vehicle's troubles resulted from problems outside the scope of the warranty. In response to inquiries concerning Mr. Harrell's continuing misfortunes with his vehicle, Nielson further stated:
 "Q Well, does it puzzle you that these qualified dealerships then couldn't put that car in good running condition if it were not a lemon?
"A Yes, sir."
 Plaintiffs' Demand for Attorney's Fees
Volkswagen contests, inter alia: (1) The trial court's refusal to give their requested *Page 161 
charge # 4[6]; and (2) the trial court's granting of Plaintiffs' motion in limine ordering Defendant not to mention to the jury the fact that attorney's fees should not be a matter for their consideration or deliberation.
The gravamen of Appellant's argument in this area is that, because attorneys' fees may be allowed a prevailing plaintiff under provisions of the Magnusson-Moss Federal Warranty Act,15 U.S.C. § 2310 (d)(2) (1976), the natural tendency of jurors to award attorneys' fees to successful litigants should have been negated either by disallowing Plaintiffs' motion in limine or by the giving of Defendant's requested charge # 4.
We think this requested instruction was purely "cautionary" in nature, not affecting the determination of liability or the measure of damages. Charging a jury about every conceivable matter as to which it should not misbehave or miscalculate would be burdensome, and could be confusing.
The giving of "cautionary" instructions is subject to the trial judge's discretion. In this regard, Corpus Juris Secundum states:
 "The giving of cautionary instructions stands on a different footing from the giving of instructions on the law of the case and is a matter very much within the discretion of the court. It is generally held that their refusal cannot ordinarily be assigned as error." 5A C.J.S. Appeal and Error § 1775 (1958).
 "What instructions should be given for the guidance of the jury, and their nature, depends on the evidence in the particular case. The jury need be told only the law applicable to their duty in the particular case. The giving or refusal of cautionary instructions rests largely in the discretion of the trial court; therefore the refusing of them is not error, especially where there is nothing in the evidence to indicate that they are needed, or where the jury are fairly instructed on the law of the case, and the refusal of the instruction does not prejudice the party requesting it." 88 C.J.S. Trial § 320 (1955).
We are unable to accede to Volkwagen's suggestion that the trial judge abused his discretion by granting Plaintiffs' motion in limine or by his refusal to give the requested charge. Consequently, we find no reversible error therein.
 Plaintiffs' "Out of Court" Conversation
Plaintiffs' written warranty contains certain exclusions, one of which reads:
 "3. VWoA is not responsible for damage or malfunctions resulting from:
 "(I) misuse, negligence, alteration, accident or fire;
". . .
 "(IV) failure to follow recommended maintenance requirements."
One of Volkwagen's authorized representatives, Freeway Volkswagen of Seattle, Washington, performed extensive repairs on the engine in Plaintiffs' vehicle. Stamped upon the service invoice for these repairs was a warning: "Important — Return car at 1,000 miles for cylinder head retorque."[7] Plaintiffs, however, traveled the 2200 miles from Seattle to El Paso before "returning" the vehicle for a "checkup."
Volkswagen contends that the problems Plaintiffs encountered from Seattle to El Paso resulted from their failure to follow the mandate to retorque the "new" engine after the first 1000 miles. Mr. Harrell's testimony was to the effect that he delayed in having this "check-up" because of his reliance upon his conversation with an employee of Freeway Volkswagen in Seattle. These contentions, and their relation to Plaintiffs' alleged conversation at Freeway *Page 162 
Volkswagen, find their genesis in the following extract from the record:
 "Q Mr. Harrell, this Freeway service order, Plaintiffs' Exhibit 7 which has been admitted into evidence, it has got the notation on it: `Important — Return car at 1000 miles for cylinder head retorque.' Did you have any discussion with the service manager there at Freeway concerning the retorqueing?
". . .
 "MR. GARRETT: Your Honor, we object to any discussion between him and the dealership. . . .
". . .
". . . This is an out-of-Court statement."
Our review of this evidentiary issue begins with an analysis of the Defendant's stated ground of objection to the question, and the Plaintiffs' contention in support of the trial judge's ruling. The Defendant objected on the ground of hearsay; that is, that Plaintiff sought to prove by his own testimony an out-of-court statement made by another for the purpose of proving the truthfulness of the matter asserted therein. To this objection, Plaintiff insisted that the evidence was not excludable under the hearsay rule because its purpose was not to prove the truth of the matter asserted, but merely to show the circumstances under which he made the 2200-mile trip from Washington to Texas without having the engine retorqued.
While it is apparent that both parties perceived the problem as falling classically within the hearsay dichotomy, it is equally apparent, from the record, that the trial judge perceived the problem as one involving a dimension not encompassed in the contention of either party. Implicit in the trial judge's comments in overruling the hearsay objection is the recognition that central to the issue of admissibility is the question of agency. That is to say, the admissibility of the proffered evidence depends upon whether the employee of the Volkswagen dealership had the authority to bind Defendant Volkswagen with respect to a modification of the written conditions which accompanied the service repairs performed by the dealership.
It is apparent, then, that the trial judge saw beyond the limited scope of the purpose encompassed in Plaintiffs' offer of the evidence. Indeed, as the trial judge correctly perceived, had Mr. Harrell succeeded in limiting its purpose to an explanation of why he drove further than the 1000-mile limit initially imposed, before retorquing his engine, he may have failed in one of the essential elements of his claim: that the 1000-mile condition had been subsequently expanded to 2200 miles by the oral statement of Defendant's agent, who not only performed the work, but also initially imposed the more stringent 1000-mile condition.
Although the agency issue was not raised at trial and is not here presented for review, we find sufficient evidence to support the trial court's implicit finding of the agent's authority to bind Volkswagen with respect to the modification of the written conditions. One who has authority to perform warranty work, and impose conditions thereon, certainly has authority to modify those conditions. No citation of precedent is necessary for the proposition that, unless the principal otherwise restricts an agent, one who has authority to impose conditions retains authority to modify those conditions.
The fact of the agency issue, however, does not change the hearsay character of the purported statement. But, given the agent's authority to modify the warranty conditions, the hearsay statement is nevertheless admissible. This type of hearsay — a statement made by a party opponent, or his agent, going to the very essence of the transaction upon which the claim is based — is of the variety classically admitted at common law. For an excellent discussion and citation of authorities in support of the "party opponent" exception to the hearsay rule, see D. Binder, The Hearsay Handbook, § 28 "Admission of Party Opponent," p. 177 (1975).
The Federal Rules accomplish the same result by classifying any statement by a party opponent, or a party's agent made *Page 163 
within the course and scope of the agency, as non-hearsay. Rules 801 (d)(2) and 803 (1), Federal Rules of Evidence (West 1980). Under either conceptual approach, the trial judge's ruling of admissibility was correct. (We are not faced with whether oral statements can vary a written contract, and our discussion is not intended to reflect upon this unraised issue.)
 Notice Provisions Under the Warranty
Volkswagen submits that the trial court erred in denying its motions for a directed verdict on grounds that Plaintiffs failed to comply with the "notice" provisions under its warranty.
Plaintiffs' vehicle was warranted for one year or 20,000 miles, whichever came first. Plaintiffs last took their vehicle to an authorized VW dealership for service on December 10, 1981, when they visited Imperial Volkswagen, Inc., of Dothan, Alabama. As of December 23, 1981, the date when Plaintiffs got their van back from Imperial Volkswagen, the vehicle had been in four different authorized VW repair shops for a total of 33 days in a four-month period, commencing with the visit to Freeway Volkswagen of Seattle on August 13, 1981. Additionally, according to Mr. Harrell, the van had visited repair shops on other occasions for less than "extended" visits.
Volkswagen argues that because Plaintiffs last visited an authorized VW dealership on December 10, 1981; Defendant inspected Plaintiffs' vehicle on March 30, 1982; and the warranty on the vehicle did not expire until April 1, 1982, the Plaintiffs were dilatory in their efforts to: 1) Return the vehicle to an authorized VW dealership within the warranty period, and/or 2) afford Defendant with sufficient "notice" of the problems they were encountering.
Volkswagen's contentions in this area are without merit. To hold in this instance, as Defendant suggests, that Plaintiffs were less than diligent in their efforts to achieve, at the hands of Defendant, safe and trouble-free transportation would place an unreasonable burden on the innocent purchaser of a defective product. Stated another way, we fail to see what more one could have demanded of Plaintiffs in their efforts to have the Defendant "fix" their vehicle. Repetitious trips to authorized VW dealerships, as well as correspondence with VW's regional and national offices, could scarcely be said to fall without the realm of "proper notice" and an "opportunity to repair the van."
 Incidental and Consequential Damages
Plaintiffs' warranty herein provided in part:
 "7. VWoA is not responsible for loss of time, inconvenience, loss of use of the vehicle or other consequential damages."
The trial court allowed Plaintiffs to introduce evidence of $620.18 in consequential damages, occasioned by problems with their vehicle during the warranty period. These damages included motel bills, food bills, rental car expenses, taxi fares, and other charges. In Winchester v. McCulloch BrothersGarage, 388 So.2d 927, 928 (Ala. 1980), this Court held that if a jury finds that the limited warranty has "failed of its essential purpose," it may then award damages under the general remedy provisions of the Uniform Commercial Code.
Code 1975, § 7-2-714, reads as follows:
 "(1) Where the buyer has accepted goods and given notification (subsection (3) of section 7-2-607) he may recover as damages for any nonconformity of tender the loss resulting in the ordinary course of events from the seller's breach as determined in any manner which is reasonable.
 "(2) The measure of damages for breach of warranty is the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted, unless special circumstances show proximate damages of a different amount, and nothing in this section shall be construed so as to limit the seller's liability for damages for injury to the person include those damages ordinarily allowable in such actions at law. *Page 164 
 "(3) In a proper case any incidental and consequential damages under section 7-2-715 may also be recovered." (Acts 1965, no. 549, p. 811.)
We know of no better example of a limited warranty "failing of its essential purpose" than that exhibited by the facts before us. Here, we do not have a case of an isolated incident of misfortune; rather, Plaintiffs purchased an expensive recreational vehicle which Defendant, or its agents, after repeated attempts, did not repair. Indeed, the last-quoted sentence from paragraph 7 of the written warranty recognizes that "[s]ome states do not allow the exclusion . . . of . . . consequential damages. . . ." The legislatively pronounced public policy, as interpreted by Winchester, demonstrates that, "in a proper case," Alabama is one such state.
A contract limitation of remedies to repair or replacement is allowed under proper circumstances. Such a limitation, however, will not be allowed "where circumstances cause an exclusive or limited remedy to fail of its essential purpose," Code 1975, §7-2-719 (2); nor will such a limitation be allowed if "the limitation or exclusion is unconscionable," Code 1975, §7-2-719 (3). Burbic Contracting Co., Inc. v. Cement AsbestosProd. Co., 409 So.2d 1 (Ala. 1982). Situations will arise "where an apparently fair and reasonable clause because of circumstances fails in its purpose or operates to deprive either party of the substantial value of the bargain." Official Comments, Code 1975, § 7-2-719. In those cases, the limitation of remedies will not be allowed.
The case before us is one of those situations in which the limited remedy, provided in the written warranty, has failed of its essential purpose. The Burbic Court stated:
 "A limitation of remedies to repair or replace goods fails in its essential purpose if the seller does not provide goods which conform to the contract within a reasonable time." 409 So.2d at 5.
Here, the Defendant, through its authorized dealerships, was given four opportunities to repair or replace defective parts. Defendant failed to fix the various defects in the Volkswagen during a four-month period prior to the time this suit was filed. This, then, is one of those cases in which a limitation of remedies will not be upheld; therefore, the Plaintiffs are entitled to the remedies outlined in Code 1975, §§ 7-2-714 and -715.
 The Trial Court's Award of Attorneys' Fees
Volkswagen next complains that the $9,138.72 ($8,650.85 attorneys' fees and $487.87 expenses) awarded Plaintiffs, in addition to their judgment for $10,000, evidenced a clear abuse of discretion by the trial court.
We note with particular interest Defendant's lack of explanation as to why the trial court threatened it with a $100-a-day fine unless it responded to certain items of Plaintiffs' requested discovery by April 13, 1982. Additionally, Defendant refused, absent a court order, to produce its own brochure on its van, to admit the genuineness of its own warranty document, and to state its suggested retail price for the vehicle. All of these, as we see them, were unjustifiable attempts to retard what was proper discovery by Plaintiffs' counsel. Such delaying tactics necessitated that Plaintiffs file a total of five motions for relief under ARCP 37.
Plaintiffs' demand for attorneys' fees and expenses was supported by affidavit, as well as by expert testimony, to the effect that the amounts requested were fair and reasonable. Considering all the circumstances, we think these amounts were not excessive.
AFFIRMED.
TORBERT, C.J., and MADDOX, SHORES and BEATTY, JJ., concur.
[1] "If a consumer finally prevails in any action brought under paragraph (1) of this subsection, he may be allowed by the court to recover as part of the judgment a sum equal to the aggregate amount of cost and expenses (including attorneys' fees based on actual time expended) determined by the court to have been reasonably incurred by the plaintiff for or in connection with the commencement and prosecution of such action, unless the court in its discretion shall determine that such an award of attorneys' fees would be inappropriate."
[2] The warranty is voided for misuse or failure to follow recommended service.
[3] Defendant cited, as authority for this instruction, the Magnusson-Moss Federal Warranty Act, 15 U.S.C. § 2310 (1976).
[4] The amount awarded was compensatory only, including consequential and incidental damages.
[5] Testimony at trial revealed that this problem occurred a total of five times.
[6] "In your deliberations you are not to take into account attorneys' fees. This matter is left to the discretion of the Court and will be handled by the Court in a latter proceeding [citing Magnusson-Moss Federal Warranty Act]."
[7] The purpose of this "retorque" procedure is to afford the dealer/manufacturer an opportunity to get a second look at the engine after it has been running so as to assure proper synchronization and determine what adjustments, if any, might then be needed. *Page 496