2305

BISHOP LOGGING COMPANY, Respondent v. JOHN DEERE INDUS-
TRIAL EQUIPMENT CO., and Construction Equipment Sales, Inc., De-
fendants, of whom John Deere Industrial Equipment Co. is Appellant.

(455 S.E. (2d) 183)

Court of Appeals

*M. Dawes Cooke, Jr., Robert P. Gritton* and *Thomas B.*

*Pritchard,* all of *Barnwell, Whaley, Patterson & Helms,* Charleston; and *W.D. Rhoad, III, of Rhoad, Rhoad & Rhoad,* Bamberg, *for appellant.*

*Paul N. Siegel* and *Harriet A. Bonds, Marvin C. Jones, Christy Scott Stephens* and *Jennifer E. Duty, of Bogoslow & Jones,* Walterboro, *for respondent.*

Heard Dec. 7, 1994.

Decided Feb. 13, 1995; Reh. Den. Mar. 31, 1995.

CURETON, Judge:

Respondent Bishop Logging Company (Bishop Logging) brought this action against John Deere Industrial Equipment Company (John Deere), Construction Equipment Sales, Inc. (CES), and Denharco, f/k//a Hurricana Metals, charging fraud, negligent misrepresentation, and breach of express warranty in connection with the sale of several pieces of heavy forestry equipment which were to be utilized in a novel swamp logging operation. The jury returned a verdict for Bishop Logging on each cause of action against John Deere,[1] and awarded Bishop Logging $1,000,000 in actual damages and $1,200,000 in punitive damages. The trial court denied John Deere's posttrial motions for judgment n.o.v., new trial, and new trial nisi. We affirm in part and reverse in part.

## FACTS

Bishop Logging Company is a large, family-owned logging contractor formed in 1980 in the lowcountry of South Carolina. Bishop Logging has traditionally harvested pine timber. However, in 1988 Bishop Logging began investigating the feasibility of a fully mechanized hardwood swamp logging operation when its main customer, Stone Container Corporation, decided to expand hardwood production. In anticipating an increased demand for hardwood in conjunction with the operation of a new paper machine, Stone Container requested that Bishop Logging harvest and supply hardwood for processing at its mill. In South Carolina, most suitable hardwood is lo-

---

[1] Denharco was dismissed from the case after filling bankruptcy. The jury returned a verdict in favor of CES on all causes of action, and Bishop Logging has not appealed that verdict.

cated deep in the swamplands. Because of the high accident risk in the swamp, Bishop Logging did not want to harvest hardwood by the conventional method of manual felling of trees.[2] Since Bishop Logging had already been successful in its totally mechanized pine logging operation, it began a search for improved methods of hardwood swamp logging centered on mechanizing the process in order to reduce labor, minimize personal injury and insurance costs, and improve efficiency and productivity.

A fully mechanized swamp logging operation was a new concept in hardwood logging. As planned, it consisted of three components. First, a feller-buncher would cut the timber. The feller-buncher was a tract-mounted mobile saw which would travel through the swamp to the timber. Second, a mobile stroke delimber would travel behind the feller-buncher to the felled tree. It would remove the limbs, top the tree, and prepare it to be dragged from the swamp. Finally, grabble skidders would remove the logs from the swamp to log trucks.

As Bishop Logging knew that no fully mechanized swamp logging package of equipment was available for purchase, it launched a campaign to design a package to suit its needs. Its search began with a number of equipment companies and manufacturers. Adrian Bishop, the president of Bishop Logging, approached representatives of John Deere, Hurricana, and CES to determine if existing equipment could be modified to work in a swamp environment. In cooperation with the sales representatives, Bishop Logging investigated various types of equipment, including observing some of the equipment operating in different conditions.[3]

Bishop Logging ultimately purchased several pieces of John

---

[2] Conventional hardwood logging is very labor intensive requiring workers to walk through the woods and manually cut and delimb trees with a chainsaw. A tractor-like machine called a cable skidder approaches the cut tree and the operator of the skidder gets off the machine and manually places a cable around the log and hooks it up to the machine. The operator then gets back on the skidder and drags the tree to a log deck, which is a marshalling area for cut trees, and unloads.

[3] In December 1988, a trip was arranged to Bangor, Maine so that Bishop Logging could further investigate the capabilities of a Hurricana delimber and view it in operation. In Maine, Bishop first visited a logging operation that was using a delimber made by Pro Pac, a competitor of Hurricana. The next day Bishop observed a Hurricana delimber, mounted on John Deere 690 excavator, operating in frozen conditions. Adrian Bishop testified that they

Deere equipment to comprise the system. This equipment included a Model 693D excavator on which a Koehring feller-buncher was attached, a Model 690D excavator with an attached Hurricana stroke delimber, and three Model 548D grapple skidders with oversized tires. The gross sales price of the machinery was $608,899. All the equipment came with a written John Deere "New Equipment Warranty," whereby John Deere agreed only to repair or replace the equipment during the warranty period, and did not warrant the suitability of the equipment. Hoping to sell more equipment if the Bishop Logging system was successful, however, John Deere agreed to assume part of the risk of the new enterprise by extending its standard equipment warranties notwithstanding the unusual use and modifications to the equipment.

Soon after being placed in operation in the swamp, the machinery began to experience numerous mechanical problems. John Deere, through CES, made over $110,000 in warranty repairs on the equipment. However, Bishop Logging contended the swamp logging system failed to operate as represented by John Deere and, as a result, it suffered a substantial financial loss.[4]

## I.

On appeal, John Deere first asserts the court erred in failing to grant its motions for directed verdict and judgment n.o.v. on the fraud cause of action because it did not make misrepresentations of present fact about thee suitability of the equipment for the swamp logging operation. Bishop Logging, on the other hand, contends that John Deere engaged in fraud by representing that this unprecedented logging operation would work and that Bishop Logging had the support and backing of John Deere one hundred percent.

---

were very impressed with the quickness of the machine and they felt the machine would be productive in hardwood application. CES also arranged for a demonstration of the 548 skidders with large 44-inch tires, operating in the Salkehatchee swamp. Bishop never viewed a demonstration of the feller-buncher or the delimber tracking through the swamp.

[4] According to its expert witness, the total financial loss to Bishop Logging was either $540,921 or $723,320 for the three-year estimated life of the equipment. The difference depended upon the price Bishop Logging received per cord of wood logged by it.

We can reverse a jury verdict only if it is without evidentiary support. *Townes Associates, Ltd. v. City of Greenville,* 266 S.C. 81, 221 S.E. (2d) 773 (1976). Furthermore, in deciding motions for directed verdict and judgment notwithstanding the verdict, the evidence and all reasonable inferences must be viewed in the light most favorable to the nonmoving party. If more than one inference can be drawn from the evidence, the case must be submitted to the jury, *Howard v. State Farm Mut. Auto. Ins. Co.,* 316 S.C. 445, 450 S.E. (2d) 582 (1994).

Viewing the evidence in the light most favorable to Bishop Logging, we conclude that ample evidence exists to support Bishop Logging's contention that the forestry equipment did not work in the swamp as well as anticipated. Nevertheless, there was no evidence, let alone clear, cogent, and convincing evidence, that John Deere committed fraud upon Bishop Logging. *See O'Shields v. Southern Fountain Mobile Homes, Inc.,* 262 S.C. 276, 204 S.E. (2d) 50 (1974) (Fraud must be proven by clear, cogent and convincing evidence).

Adrian Bishop testified about a conversation he had with Ed Benizzi, a territory manager for John Deere, during a demonstration of the grapple skidder. According to Bishop, he told Benizzi he depended upon the system working because of the cost of the equipment. Bishop testified Benizzi affirmed the "operation would work as you see it and as I'm telling you about it," and that Bishop Logging "had the support and backing of John Deere 100 percent." Benizzi further told Bishop the warranties on the skidders would be honored even though the fuel injection system was boosted fifteen percent to give the skidders more power. Additionally, Benizzi told Bishop all warranties on the Model 693 feller-buncher would be honored even though Bishop wanted to use a Koehring head on it as opposed to a Hurricana head. During cross-examination, Benizzi testified he told Bishop he would insure the fact that skidders would function properly in the swamp environment and John Deere would keep the equipment up.

Not every statement made in the course of a commercial dealing is actionable at law. It is well settled that to establish actionable fraud there must first be a false representation. *Emerson v. Powell,* 283 S.C. 293, 321 S.E. (2d)

629 (Ct. App. 1984); *Jones v. Cooper*, 234 S.C. 477, 109 S.E. (2d) 5 (1959). The false representation must be predicated upon misstatements of fact rather than upon an expression of opinion, an expression of intention or an expression of confidence that a bargain will be satisfactory. *Winburn v. Ins. Co. of N. America*, 287 S.C. 435, 339 S.E. (2d) 142 (Ct. App. 1985); *see also* 37 Am. Jur. (2d) *Fraud and Deceit* §§ 45-47 (1968); John S. Herbrand, Annotation, *What Constitutes "Affirmation of Fact" Giving Rise to Express Warranty Under UCC § 2-313(1)(a)*, 94 A.L.R. (3rd) 729 (1979). The distinction between a matter of fact and a matter of opinion is generally characterized by what is susceptible of exact knowledge when the statement is made. *Gilbert v. Mid-South Machinery, Co., Inc.*, 267 S.C. 211, 227 S.E. (2d) 189 (1976) (statement about profitability of business was statement of fact given existence of business records when statement was made).

Furthermore and of particular relevance here, the fraudulent representation must relate to a present or pre-existing fact and it cannot ordinarily be based upon an unfulfilled promise to perform in the future or statements as to future events. *Emerson*, 283 S.C. at 296, 321 S.E. (2d) at 631. As our Supreme Court most aptly explained in *Coleman v. Stevens*, 124 S.C. 8, 15-16, 117 S.E. 305, 307 (1923):

> Deceit or fraudulent representation, in order to be actionable, must relate to existing or past facts, and the fact that a promise made in the course of negotiations is never performed does not in and of itself constitute nor evidence fraud. A mere breach of a contract does not constitute fraud. . . . [a] future promise is not fraudulent unless such a future promise was part of a general design or plan existing at the time, made as part of a general scheme to induce the signing of a paper or to make one act, as he otherwise would not have acted, to his injury.

In view of the fact the fully mechanized swamp logging system was an unprecedented and untried concept, the statements of Benizzi about the future performance of the system in the swamp environment were statements of opinion or promises of future performance as opposed to false statements of present or pre-existing fact. Bishop Logging knew that the swamp logging venture was a pioneering effort.

In fact, Bishop admitted that Benizzi informed him that a fully mechanized swamp logging package had never been attempted. Because we find that Benizzi only rendered an opinion as to future performance, his representation cannot be the basis for a finding of fraud.[5] Accordingly, the court erred in failing to grant John Deere's motion for directed verdict on the fraud cause of action.

## II.

With respect to the claim of negligent misrepresentation, John Deere argues the court erred in failing to grant its motions for directed verdict  and judgment n.o.v. because Bishop Logging improperly pleaded its breach of warranty claim as the tort of negligent misrepresentation, and therefore circumvented the contractual exclusion of consequential damages.[6] John Deere also asserts a tort cause of action based upon negligent conduct is not applicable in a product liability case between commercial entities where only economic loss is involved. Under the specific facts of this case, we agree with John Deere's position.

---

[5] *See also Logan Equip. Corp. v. Simon Aerials, Inc.*, 736 F. Supp. 1188, 1201 (D. Mass. 1990), a factually similar case where the federal district court in Massachusetts concluded that a "personal guarantee" that a prototype 80-foot fully hydraulic boomlift would be "foolproof," "failproof" and that "nobody would have a problem with it," were statements of opinion, and, as such, not fraud. In rejecting the fraud claim, the court opined that the feasibility of the proposed 80-foot lift was a matter of opinion or judgment not susceptible of actual knowledge due to the novelty of the machine.

[6] In South Carolina, the common law tort of negligent misrepresentation is based upon the following elements: (1) the defendant made a false representation to the plaintiff; (2) the defendant had a pecuniary interest in making the statement; (3) the defendant owed a duty of care to see that he communicated truthful information to the plaintiff; (4) the defendant breached the duty by failing to exercise due care; (5) the plaintiff justifiably relied upon the representation; and (6) the plaintiff suffered a pecuniary loss as the proximate result of his reliance upon the representation. *AMA Management Corp. v. Strasburger*, 309 S.C. 213, 420 S.E. (2d) 868 (Ct. App. 1992). To be actionable, the representation must relate to a present or pre-existing fact and must be false when made. The representation cannot ordinarily be based on unfulfilled promises or statements as to future events. *Fields v. Melrose Ltd. Partnership*, — S.C. —, 439 S.E. (2d) 283 (Ct. App. 1993). The tort has most often been applied in situations where the misrepresented facts induced the plaintiff to enter a contract or business transaction. *Gilliland v. Elmwood Properties*, 301 S.C. 295, 391 S.E. (2d) 577 (1990).

The "economic loss" rule developed in product liability cases to assist in determining whether contract or tort theories were applicable to a given situation. "Where a purchaser's expectations in a sale are frustrated because the product he bought is not working properly, his remedy is said to be in contract alone, for he has suffered only "economic" losses. Conversely, where a purchaser buys a product which is defective and physically harms him, his remedy is in either tort or contract." *Kennedy v. Columbia Lumber and Mfg. Co., Inc.*, 299 S.C. 335, 345, 384 S.E. (2d) 730, 736 (1989) (economic loss rule partially rejected by South Carolina Supreme Court in residential home building context. The court expressly noted, however, that where duties are created solely by contract, the economic loss rule still applies and no cause of action in negligence will lie).

Our Supreme Court has not yet determined whether the economic loss rule would be specifically applicable in the commercial arena. *Kershaw Cty. Bd. of Educ. v. U.S. Gypsum Co.*, 302 S.C. 390, 396 S.E. (2d) 369 (1990). However, the majority of jurisdictions which have considered the issue have not permitted the recovery of purely economic loss in a product liability action sounding in tort. *See e.g., Clark v. Int'l Harvester Co.*, 99 Idaho 326, 581 P. (2d) 784 (1978) (purely economic losses not recoverable under negligence theory); *Arizona v. Cook Paint & Varnish Co.*, 391 F. Supp. 962 (D. Ariz. 1975) (concluding that under the laws of either Arizona, California, Hawaii, Texas or Alaska purely economic losses were not recoverable in strict liability or negligence actions), *aff'd* 541 F. (2d) 226 (9th Cir. 1976); *Cooley v. Salopian Industries, Ltd.*, 383 F. Supp. 1114 (D.S.C. 1974) (applying South Carolina law, the court held that buyers who incurred damage only to equipment purchased and not to themselves were not entitled to recover under doctrine of strict liability in tort); *Long v. Jim Letts Oldsmobile, Inc.*, 135 Ga. App. 293, 217 S.E. (2d) 602 (1975) (applying Georgia law to negligence action, the court held that purely economic interests are not entitled to protection against mere negligence); *Alfred N. Koplin & Co. v. Chrysler Corp.*, 49 Ill. App. (3d) 194, 7 Ill. Dec. 113, 364 N.E. (2d) 100 (1977) (applying Illinois law to negligence action, the court held that tort theory does not extend to permit recovery for solely economic losses absent property damage or personal

injury from the use of the product).[7]

The United States District Court for the District of South Carolina concluded contract law, specifically the Uniform Commercial Code, provides the exclusive rights and remedies under the economic loss doctrine to sophisticated parties in a commercial transaction when the product injures only itself and not other property belonging to the plaintiff. *Myrtle Beach Pipeline Corp. v. Emerson Elec. Co.*, 843 F. Supp. 1027 (D.S.C. 1993) (relying upon cases from the Fourth Circuit Court of Appeals interpreting South Carolina law); *see also 2000 Watermark Ass'n Inc. v. Celotex Corp.*, 784 F. (2d) 1183 (4th Cir. 1986) (a negligence action cannot be maintained for an intangible economic loss under South Carolina law). Further, specifically addressing negligent misrepresentation, the District Court held that in a commercial transaction governed by a contract where the alleged loss is purely economic and the cause of action is for mere negligent misrepresentation, the economic loss rule bars recovery for losses that have occurred from the product's failure to live up to the purchaser's expectations. *South Carolina Elec. & Gas Co. v. Westinghouse Elec. Corp.*, 826 F. Supp. 1549 (D.S.C. 1993).

The losses suffered by Bishop Logging were principally lost anticipated profits. There was no personal injury and there was no injury to other property owned by Bishop Logging. Bishop relied upon alleged representations by John Deere about the efficacy of the swamp logging system as the foundation of all three causes of action.[8] We conclude negli-

---

[7] Dean Prosser summarized the majority rule with respect to the recovery of economic losses in a product liability case sounding in negligence as follows:

> There can be no doubt that the seller's liability for negligence covers any kind of physical harm, including not only personal injuries, but also property damage to the defective chattel itself, as where an automobile is wrecked by reason of its own bad brakes, as well as damage to any other property in the vicinity. But where there is no accident, and no physical damage, and the only loss is a pecuniary one, through loss of the value or use of the thing sold, or the cost of repairing it, the courts have adhered to the rule . . . that purely economic interests are not entitled to protection against mere negligence, and so have denied recovery.

W. Prosser, *Handbook on the Law of Torts* § 101 at 665 (4th ed. 1971).

[8] The jury argument of counsel for Bishop Logging is illuminating. Counsel argued all three causes of action were based upon somewhat similar principles in that "they're all related to a representation made . . . the plaintiff has based his cause upon misrepresentations made to the plaintiff." Counsel also argued Bishop Logging's position was the representation related to "the suitability of—and the application of the swamp logging package."

gent misrepresentation is not applicable as a matter of law to this case under the economic loss rule.

Moreover, we concluded as a matter of law that the statements made by the John Deere representative were not false representations, but, instead, only opinions as to future performance. Since a false representation is an essential element required to establish negligent misrepresentation, this claim necessarily fails on this basis as well. Thus, even if our economic loss analysis expands the law beyond the point our Supreme Court is willing to approve, the negligent misrepresentation claim is still rejected because the evidence failed to establish liability for negligent misrepresentation.

## III.

Finally, John Deere contends the court erred in failing to grant its trial motions on the cause of action for breach of express warranty.[9] Specifically, John Deere claims the court erred in allowing Bishop Logging to receive lost profits and consequential damages for breach of express warranty because it effectively disclaimed express and implied warranties other than those contained in the John Deere "New Equipment Warranty," and those warranty provisions limited Bishop Logging's remedies for breach of the warranty to repair or replacement of defective parts, and explicitly excluded liability for consequential damages. Bishop Logging, on the other hand, maintains the exclusive remedy as limited "failed of its essential purpose," S.C. Code Ann. § 36-2-719(2), thus entitling it to other remedies available under the Code, including consequential damages.

Following delivery of the equipment, Bishop Logging experienced many mechanical problems, and although parts were replaced, the equipment continued to malfunction. Benizzi admitted that the equipment had a lot of down time. Barry Smith, who had sixteen years of experience and had driven all of the equipment, testified he had never seen equipment break down more times than this. He further testified the equipment malfunctioned continuously, John Deere unsuccess-

---

[9] Bishop Logging also pleaded causes of action for breach of the implied warranty of merchantability and the implied warranty of fitness for a particular purpose. Bishop took a nonsuit with prejudice on these causes of action after the presentation of the evidence.

fully attempted on many occasions to repair it, and as a result Bishop Logging could never make production.

James E. Lyons, a mechanic responsible for warranty repairs to Bishop Logging's swamp logging package, was qualified as an expert in heavy equipment repair. He testified that Bishop Logging always had problems with the carrier on the Model 690 excavator, and it was a total failure for this application. He further testified the most chronic failure was the Model 548D skidders which experienced substantial breakdowns within a few weeks of being placed in the field. In Mr. Lyons's view, the 548 skidders deteriorated because of the stress resulting from the forty-four-inch tires which had been approved by John Deere. The skidders were never "repaired to where they would work on a long-term basis," and according to Lyons, they simply were not durable in the swamp logging application.

In the "New Equipment Warranty," John Deere expressly provided: (1) John Deere would repair or replace parts which were defective in material or workmanship; (2) a disclaimer of any express warranties or implied warranties of merchantability or fitness for a particular purpose; (3) an exclusion of all incidental or consequential damages; and (4) no authority for the dealer to make any representations, promises, modifications, or limitations of John Deere's written warranty. John Deere argues that under this limited warranty, replacement of parts and repair of equipment were all that was required by it, and that this was, in fact, promptly performed upon request by Bishop with over $110,000 in warranty repairs.

Under the South Carolina Uniform Commercial Code (UCC), it is clear that the parties to a contract may establish exclusive, limited written warranties and limitation of damages as a remedy for breach thereof. S.C. Code Ann. § 36-2-719 (1977). Section 36-2-719(1) of the Code provides that the agreement may limit the buyer's remedies to repair or replacement of nonconforming goods or parts, and if such remedy is expressly agreed to be exclusive, it is the sole remedy. Section 36-2-719(3) states that consequential damages may be limited or excluded unless the limitation or exclusion is unconscionable.

Despite the exclusive remedy provisions in § 36-2-719, in certain circumstances a party may nonetheless be entitled to

the general remedies of the UCC. Section 36-2-719(2) states that when circumstances cause an exclusive remedy to "fail of its essential purpose, remedy may be had as provided in this Act." The official comments under § 36-2-719 further provide that "under subsection (2), where an apparently fair and reasonable clause because of circumstances fails in its purpose or operates to deprive either party of the substantial value of the bargain, it must give way to the general remedy provisions of this Article." *Id.* § 36-2-719 comment 1.

The purpose of the exclusive remedy of replacement or ■ repair of defective parts from John Deere's viewpoint was to give it an opportunity to make the equipment conform with the contract while limiting the risks to which it was subject by excluding direct and consequential damages that might otherwise arise. From Bishop Logging's perspective, it was to insure that the equipment would be operable in the swamp application and if the equipment did not function properly, to insure John Deere would cure any defects within a reasonable time after they were discovered. Where a seller is given a reasonable chance to correct defects and the equipment still fails to function properly, the buyer is deprived of the benefits of the limited remedy and it therefore fails of its essential purpose. *Beal v. General Motors Corp.*, 354 F. Supp. 423, 426 (D. Del. 1973).[10] In such circumstances, § 36-2-719(2) permits the buyer to pursue the other remedies provided by the UCC if the defect substantially affects the value of the buyer's bargain. S.C. Code Ann. § 36-2-719 comment 1; *see also Clark v. Int'l Harvester Co.*, 99 Idaho 326, 581 P. (2d) 784, 798 (1978).

In *Riley v. Ford Motor Co.*, 442 F. (2d) 670 (5th Cir. 1971), the United States Fifth Circuit Court of Appeals held that under the circumstances of that case, which also involved a seller's express warranty limiting the buyer's recourse to the

---

[10] *Beal* has been followed in numerous decisions. *See e.g., S.M. Wilson & Co. v. Smith Int'l. Inc.*, 587 F. (2d) 1363 (9th Cir. 1978); *Soo Line R.R. Co. v. Fruehauf Corp.*, 547 F. (2d) 1365 (8th Cir. 1977); *Custom Automated Mach. v. Penda Corp.*, 537 F. Supp. 77 (N.D. Ill. 1982); *Fargo Mach. & Tool Co. v. Kearney & Trecker Corp.*, 428 F. Supp. 364 (E.D. Mich. 1977); *Volkswagen of Am., Inc. v. Harrell*, 431 So. (2d) 156 (Ala. 1983); *Clark v. Int'l Harvester Co.*, 99 Idaho 326, 581 P. (2d) 784 (1978); *Givan v. Mack Truck, Inc.*, 569 S.W. (2d) 243 (Mo. App. 1978); *Murray v. Holiday Rambler, Inc.*, 83 Wis. (2d) 406, 265 N.W. (2d) 513 (1978).

repair or replacement of defective parts, it was "unable to conclude that the jury was unjustified in its implicit finding that the warranty operated to deprive the purchaser 'of the substantial value of the bargain.' " Like the instant case, *Riley* concerned a seller's inability to remedy numerous major and minor defects within a reasonable time. Similarly, in *Murray v. Holiday Rambler, Inc.*, 83 Wis. (2d) 406, 265 N.W. (2d) 513 (1978), it was held that a warrantor's limited remedy to repair or replace defective parts failed in its essential purpose where the cumulative effect of a substantial number of defects substantially impaired the value of the goods to the buyer.

The evidence at trial was clearly sufficient for the jury to determine that John Deere did not effectively perform its obligation to repair the equipment properly and within a reasonable time, and as a result, Bishop Logging was deprived of the substantial value of the equipment it contracted for. We therefore affirm the jury's verdict on the warranty claim implicitly finding that the limited warranty failed in its essential purpose so as to deprive Bishop Logging of the substantial value of the bargain, and, as a consequence, gave Bishop Logging the right to pursue other remedies provided by the UCC.

Notwithstanding Bishop Logging's ability to recover direct damages for breach of the warranty on the equipment due to the failure of its essential purposes, John Deere argues that the limitation of consequential damages expressed in the warranty has independent significance and should be effective to disclaim such damages under the facts of this case unless to do so would be unconscionable. In a purely commercial setting, as in this case, John Deere maintains that limitations on consequential damages are routinely upheld against challenges of unconscionability. *See Lewis Refrigeration Co. v. Sawyer Fruit, Vegetable and Cold Storage Co.*, 709 F. (2d) 427 (6th Cir. 1983). Contrary to John Deere's assertion, Bishop Logging contends the premise of "certainty of repair" underlies the entire contract, and consequently "the exclusion of consequential damages logically refers to losses incurred only during a reasonable time before which repairs are successful." Since the attempted repairs never cured the defects in the equipment or made it operable as contemplated by the limited warranty, Bishop Logging argues the exclusion of consequential damages is inapplicable to those damages caused by John

Deere's breach of its obligation to repair or replace the defective equipment.

The effect of the failure of a limited remedy under § 36-2-719(2) upon a clause excluding liability for consequential damages is a major issue that has not been resolved by the appellate courts of this State. *See* Henry Mather, *Consequential Damages When Exclusive Repair Remedies Fail: Uniform Commercial Code Section 2-719*, 38 S.C.L. Rev. 673 (1987). One line of cases holds that the exclusion of consequential damages is part of the limited remedy which has failed and hence allows the buyer to recover consequential damages. A second line of cases holds that the clause excluding consequential damages is entitled to independent significance and remains enforceable despite a failure of essential purpose unless the buyer can establish that the clause is unconscionable. *Id.* at 676-680.

In *Waters v. Massey-Ferguson, Inc.*, 775 F. (2d) 587 (4th Cir. 1985), the Fourth Circuit Court of Appeals, applying South Carolina law, addressed the issue of the effect that the failure of a repair or replacement remedy had upon the exclusion of consequential damages. In that case, Waters, a soybean farmer, purchased a Massey-Ferguson tractor to assist in his farming operation. He received a limited warranty with language limiting remedies similar in all practical respects with the John Deere Warranty. The tractor suffered chronic hydraulic failures, and the seller was unable to remedy its defects. Walter's in turn suffered serious planting delays and alleged the defective tractor was responsible for consequential damages in the form of lost profits on his crops.

Although the court held that the plaintiff-buyer could recover consequential damages, the court neither held that the exclusion was part of the failed limited remedy nor that the exclusion was unconscionable. Rather, the court interpreted the exclusion of consequential damages as applying only to those damages flowing directly from the breach of the warranty of quality and as inapplicable to those damages caused by the seller's breach of its obligation to repair or replace the defective parts. *Id.* at 591-592. In reaching this conclusion, the court declared that the threshold inquiry was one of contractual construction, and in ascertaining the intent of the parties, the court sought to determine what expectations were

aroused in the parties by their written language in light of the surrounding circumstances. The court examined the contract from three different interpretive perspectives: (1) the language used in the text of the written agreement; (2) the creative context of the contract to determine which party drafted the written terms in question in order to place upon that party the duty to articulate the agreement precisely; and (3) the commercial context with emphasis upon the precise nature and purpose of the contract and the type of goods involved. *Id.* The court concluded that the exclusion of consequential damages did not extend to the situation in which the seller failed to repair the tractor as required by the warranty, since the contract indicated that the parties contemplated repair would be possible, and thus, the parties did not anticipate any need to limit damages from the failure of this remedy. *Id.* at 592.

Likewise, the parties in the present case assumed that any mechanical problems in the equipment could be corrected. In the context of the commercial nature of the transaction, John Deere's agent knew the equipment would be used in the swamp application and knew that regular, certain repair was promised and expected in order that all of the equipment could be used for its purpose. In negotiating the sale, John Deere's agent assured Bishop Logging that "those units would function properly in [the swamp] environment," and that he would have "at [his] beck and call . . . factory support to make sure that the equipment functioned properly." Therefore, we must interpret the exclusion of consequential damages in light of this premise of "certainty of repair" which underlies the entire contract. The parties obviously agreed to exclude consequential damages in the event that John Deere performed its obligation to repair or replace defects. However, Bishop Logging could reasonably have expected to recover consequential damages when, as here, the defects were never adequately corrected and the limited remedy proved ineffectual.

The failure of the limited remedy in this case materially altered the balance of risk set by the parties in the agreement. Therefore, we conclude that the court was correct in disregarding the other limitations and exclusions on John Deere's warranties, and allowing the full array of remedies provided

by the UCC, including recovery of consequential damages and incidental losses under S.C. Code Ann. §§ 36-2-714 and 2-715.

Section 36-2-714 sets forth the normal measure of direct damages for breach of warranty. The formula for calculating direct damages is the value of the goods as warranted less the value of the goods as accepted. *See Ellison v. Heritage Dodge, Inc.*, 283 S.C. 21, 320 S.E. (2d) 716 (Ct. App. 1984). In addition to the recovery of direct damages, § 36-2-714(3) also provides for the recovery of incidental and consequential damages. Incidental damages resulting from the sellers' breach include expenses reasonably incurred in inspection, receipt, transportation, and care and custody of goods rightfully rejected as well as expenses incident to effecting cover. *See* S.C. Code Ann. § 36-2-715(1). Consequential damages include:

> (a) any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not reasonably be prevented by cover or otherwise; and
> (b) injury to person or property proximately resulting from any breach of warranty.

*See* S.C. Code Ann. § 36-2-715(2). Profits lost as a result of the breach are recoverable under this section as consequential damages. In *Marshall and Williams Co. v. General Fibers and Fabrics, Inc.*, 270 S.C. 247, 241 S.E.(2d) 888 (1978) the court indicated that consequential damages could also include additional operating expenses caused by the breach. The burden of proving the extent of loss incurred by way of consequential damages is on the buyer. S.C. Code Ann. § 36-2-715, comment 4.

In the present case, the losses suffered by Bishop Logging were primarily lost anticipated profits. There was no personal injury and there was no injury to other property owned by Bishop Logging. According to Bishop Logging's expert witness who was hired to make a study of the economic loss in this case, the total financial loss to Bishop Logging was either $540,921 or $723,323 for the three-year estimated life of the equipment. The difference depended upon the price Bishop Logging received per cord of wood logged by it. The one million dollar actual damage award recovered by Bishop Logging, however, was not only for lost profits from

not meeting expected production schedules, but also other unspecified damages which the jury awarded. Although mathematical precision is not required in the proof of loss, we believe the jury's actual damage award lacked relation to the testimony in the record offered to establish damages and apparently included impermissible, noneconomic damages.[11] To that extent, the actual damage award is reduced to the maximum total of economic damages claimed by Bishop Logging, $723,323. *See Wiggins v. Todd,* 296 S.C. 432, 373 S.E. (2d) 704 (Ct. App. 1988) (We may modify a judgment to reduce an award of damages where certain damages improperly allowed can be segregated).

As relates to the one million two hundred thousand dollar punitive damage award, we cannot sustain it because there is no evidence from which it could be reasonably inferred that John Deere deliberately intended to furnish Bishop Logging with defective equipment. In this case, recovery of punitive damages must be predicated upon a breach of contract accompanied by a fraudulent act or gross negligence, and we previously held that Bishop Logging failed to prove both its fraud and negligent misrepresentation claims. *See Floyd v. County Squire Mobile Homes, Inc.,* 287 S.C. 51, 336 S.E. (2d) 502 (Ct. App. 1985); *Cohen v. Allendale Coca-Cola Bottling Co.,* 291 S.C. 35, 351 S.E. (2d) 897 (Ct. App. 1986).

For the reasons stated herein, the judgment of the trial court is affirmed in part, and reversed in part.

Affirmed in part as modified and reversed in part.

SHAW and CONNOR, JJ., concur.

---

[11] Bishop Logging's own economic expert testified that the maximum total of economic damages was $723,323.