**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A- 2220-17T4

MARUKA USA, INC.,

      Plaintiff-Respondent,

v.

SPECIALTY LIGHTING
INDUSTRIES, INC.,

      Defendant/Third-Party
      Plaintiff-Appellant/
      Cross-Respondent,

v.

MORI SEIKI USA, INC. d/b/a
DMG/MORI SEIKI USA,
and DMG MORI SEIKI
COMPANY, LTD.,

      Third-Party Defendant-
      Respondent/Cross-Appellant.

_____

Argued September 25, 2019 – Decided November 4, 2019

Before Judges Koblitz, Gooden Brown and Mawla.

On appeal from an interlocutory order of the Superior Court of New Jersey, Law Division, Morris County, Docket No. L-2920-13.

Donald E. Taylor argued the cause for appellant/cross-respondent (Wilentz, Goldman & Spitzer PA, attorneys; Donald E. Taylor, of counsel and on the brief; Robert Selvers and Risa M. Chalfin, on the brief).

Denis F. Driscoll argued the cause for respondent Maruka USA Inc. (Inglesino Webster Wyciskala Taylor, LLC, and Pezold Smith Hirschmann & Selvaggio, LLC, attorneys; Raymond A. Selvaggio (Pezold Smith Hirschmann & Selvaggio, LLC) of the New York bar, admitted pro hac vice, Gerard F. Smith, Denis F. Driscoll, and Owen T. Weaver, on the brief).

William K. Pelosi argued the cause for respondent/cross-appellant Mori Seiki USA Inc. d/b/a DMG/Mori Seiki USA and DMG Mori Seki Company, Ltd. (Litchfield Cavo, LLP, attorneys; William K. Pelosi and Zachary E. Danner, on the brief).

PER CURIAM

This is an interlocutory appeal on leave granted arising from a dispute involving the sale of a lathe.[1] We now affirm the December 19, 2017 grant of summary judgment in favor of plaintiff Maruka USA, Inc. (Maruka) and partial summary judgment in favor of third-party defendant Mori Seiki USA, Inc. d/b/a

---

[1] A lathe is "[a] machine on which a piece of wood, metal, or other material is spun and shaped by a fixed cutting or abrading tool." Webster's II New College Dictionary 621 (1995).

DMG/Mori Seiki USA, and DMG Mori Seiki Company, Ltd. (collectively Mori Seiki).

Mori Seiki manufactures machine tools, turning centers, and lathes. Maruka distributes machinery and equipment on behalf of Mori Seiki. Specialty Lighting manufactures and sells custom lighting systems to commercial and residential customers. In November 2013, Maruka filed a complaint against defendant Specialty Lighting Industries, Inc., alleging breach of contract and conversion and requesting an order directing Specialty Lighting to immediately return its lathe or pay the full purchase price.

Specialty Lighting filed its answer, a twelve-count counterclaim, and a third-party complaint against Mori Seiki. Specialty Lighting's counterclaims alleged the following counts against Maruka: breach of contract; breach of the implied covenant of good faith and fair dealing; violations regarding remedies and warranties under the Uniform Commercial Code (UCC), N.J.S.A. 12A:1-101 to 12-26; common law fraud; and negligent misrepresentation. It pleaded the following counts against third-party defendant Mori Seiki: breach of warranty; negligent design and construction; and conspiracy. Specialty Lighting also alleged a violation of the Consumer Fraud Act (CFA), N.J.S.A. 56:8-1 to -198, against both Maruka and Mori Seiki.

A-2220-17T4

The motion court granted summary judgment, dismissing Specialty Lighting's counterclaims against Maruka. The court also denied, in part, Mori Seiki's motion for summary judgment, leaving intact Specialty Lighting's breach of warranty claim against Mori Seiki.

Specialty Lighting appeals, arguing the motion court erred both when finding the transaction did not involve "merchandise" as defined by the CFA, and when finding the agreement's statute of limitations barred Specialty Lighting's breach of warranty claim against Maruka. Mori Seiki cross-appeals, claiming the court erred in denying summary judgment as to Specialty Lighting's breach of warranty claim, because Specialty Lighting refused to accept the replacement lathe, and also erred when finding no warranty existed because the sales agreement did not apply to Mori Seiki.

The record reveals the following facts. In late 2009 and 2010, Specialty Lighting explored doing lathe work in-house, to reduce costs and complete the work on its own schedule. James McMillan, the production manager at Specialty Lighting, considered three different machines before he ultimately chose one manufactured by Mori Seiki.[2] McMillan communicated with a

---

[2] The machines at issue here are the NL2500SY/700 (NL) and the NLX2500SY/700 (NLX), computerized lathes that performed milling and drilling functions.

Maruka sales engineer and an application engineer to discuss Specialty Lighting's needs. They suggested that Mori Seiki's NL would fit Specialty Lighting's requirements. In March 2011, Specialty Lighting accepted Maruka's proposal for the NL, executed a purchase order for $264,990, and tendered a deposit in the amount of $52,990.

One or two days later, McMillan was informed that the NL was unavailable because Mori Seiki had stopped making the NL series and had transitioned to the NLX series of machines. The NLX lathes incorporated changes that NL lathe customers had requested, consumed less power, occupied less space, and circulated cooling fluid through its casting to promote thermal stability.

Maruka issued a proposal to Specialty Lighting to buy the NLX for the same price as the NL. The sales engineer told McMillan the NLX was an upgrade over the NL and that features that were optional add-ons for the NL were standard in the NLX. The sales engineer gave McMillan a brochure that included information about the NLX. In March 2011, Specialty Lighting signed a sales agreement for the NLX.

Maruka invited McMillan to attend "Innovation Days," a three-day event in Chicago where visitors could observe Mori Seiki products in operation.

A-2220-17T4

McMillan testified that at the event, Mori Seiki representatives reassured him the NLX was everything the NL was and more, with improved processing times, and "[e]verything that was familiar to an NL was going to be the same" on the NLX.

McMillan observed the NLX with a gantry loader, an optional lathe component that helped move parts to and from the cutting chamber of the machine, allowing for unattended operation. Specialty Lighting cancelled its order and on June 1, 2011, Maruka submitted a new proposal for a NLX containing the gantry loader.

Maruka's proposal contained a section titled "Mori Seiki Machine Warranty," that provided that "for a period of twenty-four (24) months, from the date of installation, any new machine tool purchased from Mori Seiki, . . . and all its parts shall be free from defects in workmanship and materials" when "under normal use and maintenance." Under the heading "Liability," the warranty stated:

> Mori Seiki's and Maruka U.S.A.['s] liability under this warranty is limited solely to the replacement or repair, at Mori Seiki's sole election, of defective workmanship or materials by Mori Seiki or an authorized distributor. Mori Seiki will not be liable for any expenses, loss or damage whether incidental, consequential or direct in connection with the sale or use of or inability to the use of the machinery for any purpose. All other warranties,

6

whether expressed or implied, including without limitation any implied warrant of merchantability or fitness for a particular purpose are hereby disclaim[ed].

The warranty also established a one-year limitation for bringing an action regarding the warranty and the machine, stating:

> Any legal action to enforce this warranty must be commenced no later than one year after the expiration of the warranty period set forth in this warranty or one year after Mori Seiki Co., Ltd. or its affiliates cease efforts to repair the Equipment or replacement part, whichever comes later.

Section five of the terms of the warranty, titled "Limited Warranty; Disclaimer of Warranties; Limitation of Liability; Pass-Through of Manufacturer's Warranties," identified additional limitations on the warranty, stating:

> This limited warranty is exclusive and in lieu of all other warranties, whether express, implied written or oral including, but not limited to, any implied warranties of merchantability or fitness . . . . No representative of seller may alter or amend this limited warranty. Seller shall not be liable for any incidental or consequential loss, damage or expense arising directly or indirectly from installation or use of the product or from any breach of warranty; rather, buyer and seller agree that the sole and exclusive remedy for breach of any warranty concerning the product shall be the repair of replacement of defective parts or, at seller's option, refund of the purchase price . . . . Buyer hereby waives the benefit of any rule that disclaimer of warranty shall be construed against the seller and

A-2220-17T4

agrees that the foregoing disclaimer in the agreement shall be construed liberally in favor of seller.

Specialty Lighting and Maruka executed a sales agreement dated June 1, 2011, for the NLX with gantry loader reflecting the new total price of $418,950. Specialty Lighting signed the agreement and paid an additional $30,800 deposit, leaving a new balance of $335,160.

The agreement included the terms and conditions detailed on the back of the sales agreement. Those terms included waivers of other warranties. It included the language that the machine would be free of defects for one year:

> 4. Limited One Year Parts and Service Warranty. Provided that the Customer complies with its obligations under this Agreement, Seller warrants that the Equipment (capital goods excluding tooling and parts not manufactured by the manufacturer of the basic machine) shall be free of defects in material and workmanship at the time of delivery for a period of one (1) year from the date the Equipment is installed at the Customer's facility . . . . Seller's sole responsibility shall be to repair or replace the part found to be defective or, at Seller's option, Seller may rescind this Agreement and, in such event, Seller's only obligation shall be to refund amounts previously paid by Customer pursuant to this Agreement . . . .

It further included language, in capital letters, disclaiming warranties:

> 5. Disclaimer of Warranties. THE ONE YEAR PARTS AND SERVICE WARRANTY PROVIDED FOR IN PARAGRAPH 4 IS THE EXCLUSIVE WARRANT MADE BY THE SELLER AND THE CUSTOMER

HEREBY WAIVES ANY AND ALL OTHER WARRANTIES, EXPRESS, IMPLIED OR STATUTORY, INCLUDING THE WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE AND ALL OTHER REMEDIES AND LIABILITIES. THE CUSTOMER ACKNOWLEDGES AND AGREES THAT NO OTHER REPRESENTATIONS OR WARRANTIES WERE MADE OR RELIED UPON BY CUSTOMER WITH RESPECT TO THE QUALITY AND FUNCTION OF THE GOODS SOLD HEREIN . . . .

The sales agreement additionally included a provision limiting remedies:

6. Exclusive Remedies and Limitation of Liability. Customer expressly agrees that the remedies granted to it in Paragraph 4 are Customer's sole and exclusive remedies and the total liability of the Seller with respect to this Agreement or the Equipment and service furnished hereunder, in connection with the performance of breach thereof, or from the manufacture, sale, delivery, installation, repair or technical direction covered by or furnished under this Agreement, whether based on agreement, warranty, negligence, indemnity, strict liability or otherwise, shall not exceed the one year parts and service warranty. Seller shall in no event be liable to the Customer, any successors in interest, third-parties, or any beneficiary or assignee of this Agreement for any direct, indirect, special, consequential, incidental or indirect damages whether arising out of breach of this Agreement, warranty or tort (including negligence, failure to warn, or strict liability) or otherwise, or any defect in or failure of, or malfunction of the Equipment, including but not limited to lost profits or revenues, loss of use of Equipment, damage to associated equipment, cost of substitute products, facilities, services, or downtime costs, lost goodwill, work stoppage, lost

material, impairment or loss of other goods, loss by reason of shutdown, interruption or non-operation, increased expenses of operation, or the costs or claims of third parties including customer of Customer.

Specialty Lighting acknowledged it had read and agreed to those provisions by signing the sales agreement.

As of December 2017, Mori Seiki's website stated: "With DMG MORI, you've got the most complete, high-quality line of machine tools on the market. You also have peace of mind – thanks to our extensive two-year warranty on non-wear machine components." This two-year warranty was also included in Mori Seiki's brochure for the NLX.

In December 2011, the NLX with gantry loader was delivered to Specialty Lighting. The Maruka application engineer was training a Specialty Lighting employee on how to use the machine when he discovered an issue with it. Maruka's service job summary form regarding the training indicated that "[i]nterference with sub-spindle occurs when standard Mori ID holders are used for drilling in sub-spindle."

In its counterstatement of undisputed material facts, Mori Seiki acknowledged that an interference point in the NL was "slightly more pronounced on the NLX." Mori Seiki stated the effect of that difference was that Specialty Lighting "might have [had] to use a slightly longer tool holder"

10

for boring bar operations. The application engineer informed Specialty Lighting of this and "also instructed them as to how the interference could be eliminated in other operations by rotating the parts so that the area being cut was on the turret side of the spindle center line."

In March 2012, Specialty Lighting sent a letter to Maruka and Mori Seiki, requesting a new machine. Mori Seiki offered to remove, redesign, and reengineer the machine Specialty Lighting had. In April 2012, Specialty Lighting sent a letter to Mori Seiki rejecting its offer, stating that the NLX it received had "fatally flawed design problems and [could not] be repaired to produce the products according to the original design specifications."

Mori Seiki disagreed that the original machine was defective but, in July 2012, agreed to replace Specialty Lighting's NLX with another NLX using a turret with a smaller profile that resulted in less interference (the replacement NLX). Because the replacement NLX would require some time to design, produce, and deliver, Mori Seiki gave Specialty Lighting a loaner machine. The parties executed an agreement to loan a DuraTurn2050MC lathe from August 1, 2012, through December 1, 2012.

Maruka informed Specialty Lighting that it wanted to install the replacement NLX at the end of May. However, on May 24, 2013, Specialty

11

Lighting informed Maruka it would not allow Maruka to deliver and install the replacement NLX without confirming that the defects in the replacement NLX had been properly corrected. Specialty Lighting visited Maruka's facility to inspect the machine and discovered that the original issue still existed. Specialty Lighting provided a list of the replacement NLX 's defects to Maruka in July 2013. Specialty Lighting represented that over the next six weeks, Maruka "continually advised" that it was addressing the list of defective items with Mori Seiki. When Specialty Lighting inspected the replacement NLX again at Maruka's facility in August 2013, however, certain requested design modifications had still not been made.

Specialty Lighting asked whether, if it accepted the replacement NLX, it could also be permitted to keep the loaner machine and the original NLX for the next six months before fully accepting the replacement NLX, to allow it to revert to another machine if the replacement NLX was unacceptable. Maruka responded by commencing this litigation in November 2013.

In April 2014, Mori Seiki offered Specialty Lighting another opportunity to accept the replacement NLX and offered to make the machine available for inspection and acceptance for a thirty-day period. It advised that if Specialty Lighting refused delivery, the replacement NLX would be sold. Specialty

12

Lighting rejected the offer, but also objected to Mori Seiki selling the replacement while litigation was pending.

Mori Seiki filed a motion for leave to sell the replacement NLX. On June 11, 2014, the motion court ordered that Mori Seiki could sell the replacement machine, after making it available for sixty days to allow Specialty Lighting to inspect it. A year later, Specialty Lighting's mechanical expert inspected the replacement machine and opined that the replacement did not conform to the parties' contract and "deviated from the [p]roposals provided to Specialty Lighting."

### I. CFA claims.

Specialty Lighting argues that the motion court erred in dismissing its CFA claim against Mori Seiki and Maruka and in denying its motion for reconsideration. When deciding motions for summary judgment, motion courts "review the competent evidential materials submitted by the parties to identify whether there are genuine issues of material fact and, if not, whether the moving party is entitled to summary judgment as a matter of law." Bhagat v. Bhagat, 217 N.J. 22, 38 (2014); R. 4:46-2(c). "An issue of fact is genuine only if, considering the burden of persuasion at trial, the evidence submitted by the parties on the motion, together with all legitimate inferences therefrom favoring

13

the non-moving party, would require submission of the issue to the trier of fact." R. 4:46–2(c). "An appellate court reviews an order granting summary judgment in accordance with the same standard as the motion judge." Bhagat, 217 N.J. at 38.

The original purpose of the CFA was to "combat 'sharp practices and dealings' that victimized consumers by luring them into purchases through fraudulent or deceptive means." Cox v. Sears Roebuck & Co., 138 N.J. 2, 16 (1994) (quoting D'Ercole Sales, Inc. v. Fruehauf Corp., 206 N.J. Super. 11, 23 (App. Div. 1985)). Now, the CFA "protect[s] the public even when a merchant acts in good faith." D'Ercole Sales, Inc., 206 N.J. Super. at 23.

The CFA defines "unlawful practice" as:

> The act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby is declared to be an unlawful practice . . . .
>
> [N.J.S.A. 56:8-2.]

N.J.S.A. 56:8-1(c) defines "merchandise" to "include any objects, wares, goods, commodities, services or anything offered, directly or indirectly to the public for sale."

The CFA further authorizes a remedy for "[a]ny person who suffers any ascertainable loss of moneys or property, real or personal, as a result of the use or employment by another person of any method, act, or practice declared unlawful under this act." N.J.S.A. 56:8-19. An ascertainable loss exists under the CFA if it is "'quantifiable or measurable,' not 'hypothetical or illusory.'" D'Agostino v. Maldonado, 216 N.J. 168, 185 (2013) (quoting Thiedemann v. Mercedes-Benz USA, LLC, 183 N.J. 234, 248 (2005)). The remedy includes treble damages and reasonable attorneys' fees. N.J.S.A. 56:8-19.

"The CFA requires a plaintiff to prove three elements: '1) unlawful conduct by defendant; 2) an ascertainable loss by plaintiff; and 3) a causal relationship between the unlawful conduct and the ascertainable loss.'" D'Agostino, 216 N.J. at 184 (quoting Bosland v. Warnick Dodge, Inc., 197 N.J. 543, 557 (2009)).

"[I]t is well-established that the CFA is applicable to commercial transactions." All the Way Towing, LLC v. Bucks Cnty. Int'l, Inc., 236 N.J. 431, 443 (2019). The Supreme Court has clarified, however, that "context is

15

important" and that not "all business-to-business transactions automatically fit the intendment of a sale offered to the public." Ibid. "In business-to-business transactions it is the 'nature of the transaction' that will determine whether it can fit within the CFA's definition of 'merchandise.'" Id. at 447 (quoting D'Agostino, 216 N.J. at 187).

The CFA may apply to custom-made goods. Id. at 443-45. See, e.g., Czar, Inc. v. Heath, 198 N.J. 195, 197, 209-10 (2009) (applying the CFA to the building and installation of custom kitchen cabinets); Sprenger v. Trout, 375 N.J. Super. 120, 128, 134 (App. Div. 2005) (holding the CFA applied to the "business of customizing and refabricating automobiles"); Perth Amboy Iron Works, Inc. v. Am. Home Assurance Co., 226 N.J. Super. 200, 204-05, 211 (App. Div. 1988) (holding the CFA applied to a transaction involving a yacht manufactured by defendant with a custom modification to the engine).

The Court recently adopted four considerations "[t]o promote consistency in assessing the nature of a transaction in a business-to-business setting for purposes of determining whether the CFA will apply to the merchandise." All the Way Towing, 236 N.J. at 447. Those four considerations are:

> (1) the complexity of the transaction, taking into account any negotiation, bidding, or request for proposals process; (2) the identity and sophistication of the parties, which includes whether the parties received

16

legal or expert assistance in the development or execution of the transaction; (3) the nature of the relationship between the parties and whether there was any relevant underlying understanding or prior transactions between the parties; and . . . (4) the public availability of the subject merchandise.

[Id. at 447-48.]

To meet the public availability requirement, a party may show "that any member of the public could purchase the product or service, if willing and able, regardless of whether such a purchase is popular." Id. at 447.

Here, the motion court dismissed Specialty Lighting's CFA claim as to both Maruka and Mori Seiki. The court found that the CFA did not apply to the transaction because it did "not involve merchandise 'offered . . . to the public for sale.'" See N.J.S.A. 56:8-1(c). It compared this matter to Princeton Healthcare System v. Netsmart New York, Inc., 422 N.J. Super. 467 (App. Div. 2011), where we held that because the parties were sophisticated corporate entities that had entered into a heavily-negotiated contract for the sale of a custom-made program that involved the plaintiff's computer consultant and legal counsel as active participants, the product was not "merchandise" under the CFA and the CFA did not apply.

The motion court here found that, although the NLX Specialty Lighting ordered was sold from a brochure, it was "made to order[,] assembled with

accessories . . . unique to a purchaser's needs and specific functions," and took a long time to produce. The court also reasoned that "the parties spent many months determining and negotiating the particular machine and parts Specialty Lighting would purchase," and that the transaction occurred between "sophisticated corporate entities." See Princeton Healthcare System, 422 N.J. Super. at 474. The court concluded the transaction did "not constitute a 'sale of merchandise' within the intent of the CFA" and granted summary judgment.

In its motion for reconsideration, Specialty Lighting argued the motion court erred because the NLX was not custom-made. The motion court denied this motion, clarifying that Specialty Lighting had misconstrued the basis of its decision. The motion court clarified that it considered several factors to reach its decision, including: "(1) that the parties were sophisticated corporate entities; (2) that the parties spent many months [discussing] and negotiating the particular machine and parts . . . ; and (3) the [m]achine's configuration was based upon [Specialty Lighting's] needs and specific requirements."

In the recent decision of All the Way Towing, the Supreme Court affirmed our conclusion that the particular transaction between two commercial entities fell within the purview of the CFA. 236 N.J. at 434. The Court distinguished All the Way Towing from Princeton Healthcare System, because anyone from

18

the public could purchase a tow truck with the tow body that the plaintiffs had requested and the sale was "a direct consumer purchase transaction" that involved no attorneys or other experts.  Id. at 446- 48.

The object of the transaction here, the lathe, is more akin to the complex computer software in Princeton Healthcare System, than the tow truck in All the Way Towing.  The affidavits submitted by Mori Seiki demonstrate the complexity of the machine.  Additionally, Specialty Lighting informed Maruka and Mori Seiki what elements of the lathe required design corrections.  Specialty Lighting further indicated that the specific modifications it had requested had not been installed when it inspected the replacement NLX for the second time in August 2013.  These specifications further support that the lathes were specialized and complex.

Maruka provided three proposals to Specialty Lighting over the course of six months before Specialty Lighting agreed to purchase the NL, and then engaged in further discussions with Maruka and Mori Seiki to determine the requirements for the NLX.  Additionally, McMillan was familiar with its functions, and had a more specialized knowledge of lathes than the general public.  Although the machines are available for purchase to the public, there is no evidence that anyone in the public other than the type of sophisticated entity

19

with the specialized knowledge of Specialty Lighting would seek to enter into such a transaction.

Moreover, the record contains evidence that Specialty Lighting communicated through counsel, as shown by the May 2013 letter, refusing to accept the machine. Those facts support the result here. See All the Way Towing, 236 N.J. at 447-48 (considering whether the parties received legal or expert assistance in the development or execution of the transaction to determine whether the CFA applied).

After a de novo review of the record, we conclude that the transaction involved two sophisticated corporate entities that heavily negotiated a contract over a significant period of time, which involved the sale of a highly technical machine. The motion court properly found the lathe did not qualify as "merchandise" under the CFA when dismissing Specialty Lighting's CFA claims.

II. Specialty Lighting's warranty counterclaim against Maruka.

Specialty Lighting additionally asserts that the motion court improperly found the sales agreement's statute of limitations provision barred Specialty Lighting's breach of warranty claim against Maruka. It argues that its claim is not time-barred because Maruka was estopped from enforcing the statute of

limitations, Specialty Lighting did not "accept" the lathe to trigger the commencement of the statute of limitations, and Maruka guaranteed future performance.

The motion court held the one-year statute of limitations provision barred Specialty Lighting's counterclaims and rejected Specialty Lighting's arguments that there were genuine disputes of material facts. Specialty Lighting argued that the statute of limitations provision was unenforceable because it was illegible, against public policy, and unreasonable. The court found Specialty Lighting's president signed the agreement, which "explicitly alerted him to its terms and conditions, including the limitations period." The motion court concluded the provision was clearly legible, was not unconscionable, and was reasonable.

Specialty Lighting's motion for reconsideration of its breach of warranty claim against Maruka was denied by the motion court. Because Specialty Lighting raised for the first time during this reconsideration motion that N.J.S.A. 12A:2-725(2) rendered its claim timely, the motion court did not consider the argument. We "will decline to consider questions or issues not properly presented to the [motion] court when an opportunity for such a presentation is available unless the questions so raised on appeal go to the jurisdiction of the

[motion] court or concern matters of great public interest." State v. Robinson, 200 N.J. 1, 20 (2009).

Specialty Lighting does not assert that this argument was not available when it first opposed Maruka's motion for summary judgment, and the record does not suggest otherwise. See Cummings v. Bahr, 295 N.J. Super. 374, 384-85 (App. Div. 1996) (affirming a motion court's denial of the plaintiff's second motion for reconsideration because it asserted a new theory without identifying new facts or overlooked case law); see also ASHI-GTO Assocs. v. Irvington Pediatrics, P.A., 414 N.J. Super. 351, 360 (App. Div. 2010) (finding no error in denying a motion for reconsideration because the motion did not rely on matters the court had overlooked or as to which it had erred). We decline to consider arguments against the warranty raised for the first time at the motion for reconsideration or on appeal.

### III. Denial of Mori Seiki's motion for summary judgment.

#### A. Express Warranty

When deciding Mori Seiki's motion for summary judgment, the motion court first addressed whether the contract between Mori Seiki and Specialty Lighting contained an express warranty. The court found the terms and conditions of the June 1, 2011 proposal were not incorporated into the executed

sales agreement and only governed the relationship between Maruka and Specialty Lighting. Therefore, the motion court held that Mori Seiki failed to show that the executed agreement precluded Specialty Lighting from recovering under a consequential damages or breach of warranty claim against Mori Seiki.

In its cross-appeal, Mori Seiki asserts that, if the sales agreement did not govern Mori Seiki and Specialty Lighting's relationship, then the express warranty that was contained in that agreement also could not be applicable. Specialty Lighting responds that Mori Seiki misread the motion court's decision. It contends that although the motion court held that the sales agreement and proposal terms, which included the one-year statute of limitations and damages limitations, did not apply to Mori Seiki and Specialty Lighting, the court did not conclude that Mori Seiki failed to provide its standard warranty.

The motion court's statement of reasons confirm that it only held that the sales agreement did not incorporate the proposal and did not apply to Mori Seiki. Specialty Lighting was given a brochure for the NLX, which advertised a two-year warranty for Mori Seiki machines that stated: "Subject to limitations, Mori Seiki machines ordered after April 1, 2007 now have a 2-year warranty. Please contact your sales representatives for details." Specialty Lighting also provided an image from Mori Seiki's website stating that it has a two-year warranty. The

website, however, shows 2017 as the copyright year and there was no evidence presented that this warranty was offered on the website at the time that Specialty Lighting purchased the machine.

Although the brochure does not specify the scope of the warranty and directs the reader to contact a sales representative, the brochure suggests some type of express warranty, particularly when viewed in favor of the non-moving party, Specialty Lighting. Therefore, despite the motion court's finding that the sales agreement did not govern the transaction between Mori Seiki and Specialty Lighting, Specialty Lighting's breach of warranty claim against Mori Seiki survives summary judgment because there is a material dispute of fact as to the applicable warranty.

## B. Limitation of Damages

In its summary judgment motion, Mori Seiki sought to limit Specialty Lighting's damages to the time when the replacement machine was ready to be delivered. The motion court rejected the argument and denied summary judgment on the measure of damages, reasoning that in order to find the damages were limited in that way, it would have "to find that [Specialty Lighting] was obligated to accept a defective replacement." The court concluded that Mori Seiki "failed to show that [Specialty Lighting] [was] not entitled to proceed

before a jury and argue that (1) the [r]eplacement was defective and (2) damages are to be measured from the date the [m]achine was delivered to the date [Specialty Lighting] purchased a suitable replacement."

Courts are obligated to examine a contract's "plain language . . . and the parties' intent, as evidenced by the contract's purpose and surrounding circumstances." Highland Lakes Country Club & Comty. Ass'n v. Franzino, 186 N.J. 99, 115 (2006). "It is not the court's function to make a contract for the parties or to supply terms that have not been agreed upon." Schenck v. HJI Assocs., 295 N.J. Super. 445, 450 (App. Div. 1996). "When terms of a contract are clear 'it is the function of the court to enforce it as written and not to make a better contract for either party.'" Ibid. (quoting U.S. Pipe & Foundry Co. v. Am. Arbitration Ass'n, 67 N.J. Super. 384, 393 (App. Div. 1961)). Importantly, "it is clear that a contract must be interpreted considering the surrounding circumstances and relationships of the parties, at the time it was entered into, to understand their intent and to give effect to the nature of the agreement as expressed on the written page." Id. at 450-51.

Here, the sales agreement is not clear as to whether Specialty Lighting was required to accept a defective replacement machine or whether it could recover any damages accruing after the date the replacement machine was ready

to be delivered. The sales agreement references only Maruka and Specialty Lighting and has no signature line for Mori Seiki. Although underneath the description of the equipment section, it states Specialty Lighting was purchasing the Mori Seiki NLX2500SY/700 with gantry loader "and options as per quotation # NJNJ116-JAM dated 6-1-11," it does not state that the terms and conditions of that proposal are included in the sales agreement. The motion court did not err when concluding that the sales agreement and proposal did not govern Mori Seiki's and Specialty Lighting's relationship.

## C. Breach of Warranty

Finally, Mori Seiki asserts that the motion court should have found that Specialty Lighting's refusal to accept the replacement machine precluded its breach of warranty claim. Under the UCC, "where circumstances cause an exclusive or limited remedy to fail of its essential purpose, the buyer has the remedy as provided in N.J.S.A. 12A:2-719(2)." Gen. Motors Acceptance Corp. v. Jankowitz, 216 N.J. Super. 313, 329 (App. Div. 1987). "[T]he exclusive remedy of repair and replacement of defective parts fails of its essential purpose if, after numerous attempts to repair, the [product] did not operate as . . . [intended,] free of defects." Ibid. If the product or a component of the product "contains a defect or malfunction, after a reasonable number of attempts to

remedy defects or malfunctions of the product, the consumer may elect a refund including reasonable incidental expenses." Id. at 330 (citing U.S.C. § 2304(d)).

In cases where a breach of warranty provision limits a seller's obligation to repair or replace defective equipment, "before the exclusive remedy is considered to have failed in its essential purpose, the seller must be given an opportunity to repair or replace the product." BOC Grp., Inc. v. Chevron Chem. Co., LLC, 359 N.J. Super. 135, 147 (App. Div. 2003). A remedy may fail in its essential purpose if the product does not operate free of defects after several attempts to repair, "or repair or replacement take an unreasonable time to complete." Id. at 148.

To determine if a remedy failed in its essential purpose, courts "must examine 'the facts and circumstances surrounding the contract, the nature of the basic obligations of the party, the nature of the goods involved, the uniqueness or experimental nature of the items, the general availability of the items, and the good faith and reasonableness of the provision.'" Ibid. (quoting J.A. Jones Constr. Co. v. City of Dover, 372 A.2d 540, 549 (Del. Super. Ct. 1977)).

Here, the motion court denied summary judgment on Specialty Lighting's breach of warranty claim in favor of Mori Seiki because it concluded that even if "a repair-or-replace provision applie[d] to the dispute, whether the warranty

failed [in] its essential purpose [was] a question of fact." The court also found that Specialty Lighting's "refusal to accept the [r]eplacement . . . [did] not preclude [Specialty Lighting] from showing that the warranty failed [in] its essential purpose."

The motion court properly denied summary judgment because a material factual dispute existed as to the terms of the warranty and because the issue of "[w]hether an exclusive remedy fail[ed] in its essential purpose is a question of fact." See ibid. at 148. A factual question also existed as to whether the replacement machine was actually defective and, if so, whether Specialty Lighting was obligated to accept a defective machine.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION